## WEIL ET AL. *v.* SUPERVISOR OF ASSESSMENTS OF WASHINGTON COUNTY

[No. 398, September Term, 1971.]

*Decided July 3, 1972.*

*Motion for rehearing filed July 25, 1972; denied September 11, 1972.*

The cause was argued before BARNES, McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and IRVING A. LEVINE, Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Roger D. Redden,* with whom were *Piper & Marbury* on the brief, for appellants.

*William J. Rubin, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

H. H. Walker Lewis in his article *Equality in Property Assessments,* 9 Md. L. Rev. 246 (1948), tells us that the Maryland Constitution of 1776 established equality as a basic principle of property taxation, brought about by such pre-1776 actions as the Act of 1756 which "placed twice as heavy a tax on the property of papists as on that of non-papists." That act also placed a "duty on all Bachelors of twenty-five years of Age and upwards" varying according to their worth. Differences of opinion as to what constitutes equality continue on into the present and produce this litigation.

Appellants own land in Washington County improved by gasoline service stations. As is frequently the case, there is a difference of opinion between them and the assessing authorities as to the value of that land. They question the propriety of the method used by the assessor in reaching his valuation. They see four questions presented, namely:

> 1. Does Maryland law permit the land of properties actually devoted to service station use to be assessed at values disproportionate to the land values at which comparable commercial-use properties in the same neighborhood are assessed?
>
> 2. Does Maryland law permit, for assessment purposes, the independent administrative sub-classification of the land, only, of properties actually devoted to service station use, separate and apart from all other assessable land?
>
> 3. If so, does the record contain credible evidence upon which the land of properties actually devoted to service station use may be independently subclassified for assessment purposes,

separate and apart from all other land available for such commercial use?

4. Was the land of either property assessed at greater than its full cash value as of January 1, 1967?

We shall not answer each question directly because in part they seem to be based upon assumptions similar to the age-old question of when one stopped beating his wife. We join the Circuit Court for Washington County and the Maryland Tax Court in finding no error. Therefore, we shall affirm.

This case reaches us under Code (1957, 1969 Repl. Vol.) Art. 81, § 229 (1), (m), since the matter was decided by the tax court and appealed to the circuit court prior to the effective date of Chapter 385 of the Acts of 1971 providing for a direct appeal from the tax court to us. Under the applicable statute, the circuit court was obliged to affirm the tax court's order "unless such order [was] erroneous as a matter of law or unsupported by substantial evidence appearing in the record."

The new assessment for land on one tract was $19,500, compared with the prior assessment of $4,170, while the new assessment on the second tract containing two parcels was a total of $21,000, compared with the prior assessment of $5,130. The date of finality here involved was January 1, 1967.

Appellants presented an expert appraiser. He contended that the market data approach was the proper one because he said a market existed, although he used no service station sales for comparable sales on the ground he found none close enough. He placed a valuation of $12,000 on one land site and $16,000 on the other. He made no study of the income of either property, claiming that the income approach was the weakest of the possible approaches because it constituted an appraisement of management.

The assessor testified as to the manner of approach he had devised. The tax court in its opinion quoted from

the written summary he had submitted, which basically was that to which he testified:

"In preparation for a general re-assessment program in 1966 it was discovered that gasoline service station assessments were not in proper ratio to market value. The improvements were properly assessed according to Boeckh's Manual and depreciated in line with their age and condition but the land was where the greater attention was required.

"We determined several facts regarding service station sites.

(1) A minimum site for prime land is 12,-000 square feet.

(2) Prime land represents approximately 85% of the total site value.

(3) A minimum gallonage for a successful station is 20,000 gallons per month.

(4) A reasonable land rental would be $1\frac{1}{4}\cancel{c}$ per gallon net.

(5) 20,000 gallons $\times$ $1\frac{1}{4}\cancel{c}$ = $250 rent per month = $3000 per year capitalized @ 6% = $50,000 value. Since 85% is prime land ($50,000 $\times$ 85%) = $42,-500 for value of prime land. The prime land is set at 12,000 square feet therefore $42,500 $\div$ 12,000 sq. ft. = $3.54 value of prime land per sq. ft. $3.54 $\times$ 60% = $2.12—our assessment rate is $2.00.

"This was tested with a number of sales and leases, a few of which are referred to here, to prove our rates in practical application.

"To prove our method of assessing by market data:

Sale #1 Sun Oil purchased a successful service station along with a contiguous residential property for a total of *$51,000*. Our land assess-

ment for the enlarged service station site, using the same method used in assessing the subject property is *$26,000* (less than 60%).

Sale #2 Humble Oil purchased a piece of land on which they owned the building and leased the land. The purchase price for land only was $40,000. Our land assessment, using the same method used in assessing subject property is *$16,900* (less than 60%).

Sale #3 Cities Service purchased an improved piece of land for $30,000. Our land assessment, using the same method in assessing subject property is *$16,000* (less than 60% of raw land sale price).

"To prove our method of assessing by income:

Income #4 Humble's lease of the property which is the subject of Appeal #35 is a net lease of land only for $2160 plus overage to a maximum of $2910 per year with an option to buy for $45,000. The $2160 capitalized @ 6% indicates a minimum value of $36,000 and the $2910 capitalized @ 6% indicates a maximum value of $48,500. The land assessment is $19,500 (less than 60% of the *minimum* capitalized value).

Income #3 Shell Oil lease of land only is a net lease of $4,200 per year with an option to purchase for $75,000. The $4,200 capitalized @ 6% indicates a market value of $70,000. The land as-

sessment, u s i n g the same method used in assessing the subject property, is $40,500 (less than 60% of indicated value).

Income #5 Humble lease of the lot which was cleared and made a part of the existing station site at Cannon Avenue and Dual Highway and which is a part of Appeal #36, is a net lease of land only for $1080 per year. This $1080 capitalized @ 6% indicates a market value of $18,000. The land assessment is $10,-200 (less than 60% of indicated value).

"We have also found that in most instances, successful 'full service' service station sites have a different land value from other adjacent sites of a different commercial use.

"To support this:

Sale #4 & #5 Gulf Oil bought two separate 1.4 acre tracts for $16,500 each. B e r k l e y Rohrer bought a 1.5 acre tract contiguous to Gulf's tract for $7,500.

Lease #1 & #2 Mr. & Mrs. A. E. Stahl leased a part of their property to Shell for $225 per month net indicating a value of $2.73 per square foot and a contiguous part to a car wash enterprise for $50.00 per month (owner paying taxes) indicating 43¢ per square foot.

Income #6 Ambrose Used Car Sales has leased a property contiguous to Humble Appeal #35. This property which includes land and buildings indicates a total market value of *$31,000* which by the land residual method shows a land value of 94¢ per square foot. The Humble land value is indicated at $3.33 per square foot."

It is the contention of the appellants that the assessment schedule which imposes a unit rate of $2.00 per square foot on prime land actually devoted to service station use if the station pumps 20,000 gallons or more a month establishes an illegally disproportionate, non-uniform, discriminatory assessment method, and is an illegal administrative subclassification of land. They contend "that the assessment of all parcels of land located along a given highway and similarly available for highway commercial uses in the same immediate neighborhood must begin with the same method of valuation, which means the same unit values where the unit value method is applied." They further argue:

"If commercial land is to be assessed on the basis of its highest and best use, then *all* similarly situated commercial land similarly available for that same highest and best use *must* be similarly assessed, that is, by the same standards. But, if one piece of commercial land is to be assessed at $2.00 a square foot because it has something called a 'full service' service station on it, or at $1.50 if it has less than 'full service' service station on it, and another piece of commercial land in the same business area is to be assessed at $.60 a square foot because it is used as a new car sales outlet, then *only the service station land* is being assessed at its highest and best use and the car sales land is being

assessed at its lower actual use." (Emphasis in brief.)

The command of Code (1957, 1969 Repl. Vol.) Art. 81, § 14 is that "[a]ll real property . . . shall be assessed at the full cash value thereof on the date of finality," the full cash value being defined as "current value less an allowance for inflation, if in fact inflation exists." As Judge (later Chief Judge) Henderson put it in *Bornstein v. State Tax Comm.*, 227 Md. 331, 337, 176 A. 2d 859, 96 A.L.R.2d 661 (1962), "[o]rdinarily the cash value would be the current market value, or what a willing purchaser would pay to a willing seller in the open market." In *Northern Cent. Ry. v. Mayor and City Council of Baltimore,* 132 Md. 497, 104 A. 44 (1918), the statute then in effect, Code (1912) Art. 81, § 193 and Art. 23, § 313 provided that real property of railroad companies was to be assessed "for county and municipal purposes in the same manner as the property of individuals [was then] assessed and taxed." It was claimed that the taxing authorities were prohibited "from considering the utility of the property for railroad purposes in ascertaining its value for municipal taxation." Judge Pattison said for the Court:

"In assessing real estate of individuals for the purpose of taxation its full cash value is to be ascertained (Chapter 120 of the Acts of 1896) without looking to a forced sale; and in ascertaining its value all utilities of which the property is capable, and which have the effect of enhancing its value, are elements to be considered, *Brack v. Baltimore,* 125 Md. 382, and *Bonaparte v. Baltimore,* 131 Md. 80, and cases therein cited. [Both are condemnation cases.]

"If the lots of land in question, which are shown to possess special utility for railroad purposes by all the witnesses who testified before the Commission, were owned by individuals, there could be no doubt as to the authority of the taxing powers to consider that utility in

ascertaining their value for taxable purposes; or if there are other lots owned by individuals, similarly located in Jones Falls valley, possessing special utility for railroad purposes, the taxing powers of the City have the undoubted authority to consider that utility in ascertaining the value of such lots for taxable purposes.

"It is not, as suggested by the appellant's counsel, the increased value of the lots of land, resulting from the fact that they are parts or units of the railroad system, which the Commission has said may be considered in ascertaining their value, but it is the utility they possess for railroad purposes, without regard to the fact that said lots of land are parts or units of the railroad system." *Id.* at 500.

Capitalization of income has long been recognized in Maryland as a tool for assessment purposes. In *County Commissioners of Frederick County v. Sisters of Charity of St. Joseph*, 48 Md. 34 (1878), our predecessors had before them the question of an assessment for lands comprising 398 acres, part of which was used for educational purposes and was exempt from taxation, but all of which was not so used and, therefore, not exempt. In the concluding paragraph of the opinion Judge Bowie said for the Court:

"If the property is indivisible, so that the value of the several parts cannot be ascertained, the amount of the net income from the academy or school may be capitalized as the basis of assessment." *Id.* at 43.

That case was followed by *Appeal Tax Court of Baltimore City v. The Grand Lodge of A.F. & A.M. of Maryland*, 50 Md. 421 (1879), relative to the assessment on the Masonic Temple in Baltimore. It was conceded "that the lower stories of 'The Masonic Temple' [were] not used by the [corporation], but [were] rented for various purposes, thus yielding a profit to the corporation." It had been contended that the whole was exempt. Our

predecessors held otherwise and Judge Robinson said for the Court, "It is a case for the application of the principle of *capitalization,* heretofore recognized by this court." (Emphasis in the original.) The Court cited *County Comm'rs v. Sisters of St. Joseph, supra,* in its opinion, although not on the point of capitalization. The matter again came before the Court in *Mayor and City Council of Baltimore v. Grand Lodge of A.F. & A.M.,* 60 Md. 280 (1883), with a similar contention. Judge Alvey in the course of that opinion said, "It is upon the capitalization of such rentals that the assessment in question has been made, and not upon the whole building itself . . . ." The Court held that "the slight change of phraseology employed in the subsequent statutes to extend the exemption to the ground appurtenant to the building" did not "clearly justify the conclusion that the Legislature intended to change the principle settled in the case of *The County Commissioners of Frederick Co. v. The Sisters of Charity of St. Joseph,* 48 Md. 34, and which was applied in deciding the case in reference to this same property, in 50 Md. 421."

In *Meade Heights v. Tax Comm. of Md.,* 202 Md. 20, 95 A. 2d 280 (1953), Judge (later Chief Judge) Henderson said for the Court:

> "In the instant case, it was shown that there were no sales of comparable properties that could be used as a guide, and the assessors used a standard method of reproduction cost, set out in the Assessment Manual approved by the Tax Commission, based on 1944 costs of construction in an effort to eliminate any inflated costs. The figure arrived at, $1,331,508, was extremely conservative, as demonstrated by comparison with the F.H.A. estimate of reproduction cost of $3,354,755, based on three different calculations. The mortgage granted, which was less than full value, was $2,832,800. The actual cost of the buildings was probably in excess of $2,-800,000. The assessors then undertook to find

value by using a standard formula for capitalization of the gross subrents received, and arrived at a figure of $1,528,086. The difference between this figure and the figure arrived at for the buildings, $197,367.00, was ascribed to the land. It was this difference that the Tax Commission eliminated." *Id.* at 30-31.

He concluded by saying:

"We cannot find that the Tax Commission erred in declining to accept [the expert's] valuation, and accepted a figure based on capitalization of gross income, according to the usual formula which takes into account all deductible items including depreciation, but not including mortgage principal and interest. As we have pointed out, the final assessment was below the figure determined by the capitalization method, and far below the actual cost and the true reproduction cost." *Id.* at 32.

The matter of capitalization of income was again before the Court in *Bornstein,* 227 Md. 331. Again, Judge Henderson wrote for the Court. There was a contention "that the State Tax Commission made an error of law in resting its assessment upon 'capitalization of the annual gross income' derived from the apartment properties," it being argued "that the assessing authorities 'based their determinations solely upon the gross income', and that this was arbitrary and capricious and in violation of the Fourteenth Amendment of the United States Constitution." It was admitted that the capitalization of income method was not entirely without validity, but it was said "that no matter what method is used the assessment should never exceed the cost of reproduction or the replacement cost" and "that the imposition of a tax based on gross income would be a special tax not authorized by Maryland law, except in the case of certain utilities." No merit was found in the argument that use of a capitalization factor converted an *ad valorem* prop-

erty tax into one upon income. The Court said the contention that the reproduction cost was an overall ceiling could not be supported. It further commented that "[t]he mere fact that other classes of property may be assessed by a different method does not present a valid constitutional objection." In the course of that opinion Judge Henderson said for the Court:

> "The record, as amplified, makes it clear that the Tax Commission did not rely solely upon the capitalization of gross income, but also considered net income, and both original and reproduction cost. Capitalization of gross income has long been recognized as a relevant factor to be considered by the assessing authorities, particularly in assessing business properties such as apartment houses. In *Meade Heights v. Tax Comm. of Md.*, 202 Md. 20, 32, we expressly held that the Commission did not err in accepting 'a figure based on capitalization of gross income, according to the usual formula which takes into account all deductible items including depreciation, but not including mortgage principal and interest.' See also the cases collected in 95 A.L.R. 442." *Id.* at 337.

In *Easter v. Department of Assessments of Baltimore City*, 228 Md. 547, 180 A. 2d 700 (1962), the Court said:
> "The taxpayer protested the assessment of . . . an unimproved parcel of land, assessed on a front foot basis at $5,180, because he believed that the property, from which he derived no income, should not have been assessed as high as an adjacent income-producing used car lot. But the court, in finding that vacancy in and of itself did not affect the valuation for tax purposes, further found that the income-producing possibility was the controlling factor. Code (1961 Cum. Supp.), Art. 81, § 14 (b) (1), requires that property shall be assessed at 'full cash value,' and, since the lower court found no

reason to require a reduction of the assessment, we cannot, in the absence of an affirmative showing of error, disturb its finding. Rule 886 a. Cf. *Bornstein v. State Tax Commission,* 227 Md. 331, where it was pointed out that the relative weight to be accorded to any relevant factor in a particular case is for the assessing authorities and not for the courts." *Id.* at 549-50.

In *Rogan v. County Commissioners of Calvert County,* 194 Md. 299, 71 A. 2d 47 (1950), the Court stated:

"The Court cannot rule as matter of law that assessing authorities must be guided entirely by current market prices in making the assessments, regardless of how 'thin' the 'spot market' may be or how much it may be affected by conditions believed to be temporary and abnormal." *Id.* at 311.

In *Tax Commission v. Brandt Cabinet Works,* 202 Md. 533, 97 A. 2d 290 (1953), the assessing authorities valued recently erected buildings upon the basis of cost, although older buildings were valued "by reference to the cubic foot factor in the Manual." Judge Collins observed for the Court:

"In assessing the old commercial buildings in Hagerstown the same Manual was used. Therefore a uniform plan was used for the assessment of the new buildings in Hagerstown and another uniform plan was used for the assessment of the old buildings in that area. This could hardly result in intentional discrimination against Brandt or in arbitrary and unreasonable assessment. It has not been shown that either plan resulted in assessments of more than full cash value." *Id.* at 543.

Other factors relative to assessing which may be gleaned from our prior decisions include: "The valuation of property is not a judicial function, and the court cannot be required to act as a board of review in the as-

sessment of property." *C. & P. Tel. Co. v. State Tax Com.*, 158 Md. 512, 517, 148 A. 832 (1930). In *State Tax Comm. v. C. & P. Tel. Co.*, 193 Md. 222, 66 A. 2d 477 (1949), Judge Collins said for the Court:

"Valuation of property for taxation is one of the oldest forms of administrative power and the courts should not interfere with the exercise of this administrative power unless it is unlawful, unreasonable, or against the substantial weight of the evidence. Perfect equality is unattainable. If assessments could be upset by comparison of a few widely different properties, on the basis of a selected few of the many elements or evidences of value, no assessment could stand." *Id.* at 235.

In *Rogan, supra,* the Court said:

"The purpose of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States is to protect every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the provisions of a statute or by improper enforcement of a statute. Intentional and systematic undervaluation by assessors of other taxable property in the same class violates the constitutional right of a person taxed upon the full value of his property. However, mere errors of judgment on the part of State or County officials in making assessments will not support a claim of such discrimination. There must be something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officials and the validity of their actions will be presumed." *Id.* at 309.

\* \* \*

"We accept the rule, as adopted in other States, that the assessment of the property of others at a lower proportion of its value than that of a

complaining taxpayer, which is not assessed at more than its fair cash value, does not make the tax on the latter invalid, unless the assessment was fraudulently made." *Id.* at 313.

"Perfect uniformity of assessment is impossible." *Brandt,* 202 Md. 533, 543. "It is firmly established in this State that the relative weight to be accorded to any relevant factor in a particular case is for the assessing authorities and not for the courts." *Bornstein,* 227 Md. 331, 337.

Art. 15 of the Declaration of Rights was amended after this Court's decision in *State Tax Comm. v. Gales,* 222 Md. 543, 161 A. 2d 676 (1960). There the General Assembly by statute had provided, that "[l]ands which [were] actively devoted to farm or agricultural use [should] be assessed on the basis of such use, and [should] not be assessed as if subdivided or on any other basis." The changes between Art. 15 as it then stood and as it now stands may be perceived from the following, deleted matter appearing with brackets around it and new matter in italics, only that portion which is here pertinent being reproduced:

> "That . . . the General Assembly shall, by uniform rules, provide for *the* separate assessment [of land and], classification and sub-classification [s] of *land,* improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform [as to land within the taxing district, and uniform] within [the] *each* class or sub-class of *land,* improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy . . . ."

Chief Judge Brune extensively reviewed the Maryland authorities on taxation including consideration of the law prior to 1915 when Art. 15 had been last amended.

He referred to an opinion by then Attorney General Hammond in 37 Op. Att'y Gen. 424 (1952) and an article by Mr. H. H. Walker Lewis entitled *The Tax Articles of the Maryland Declaration of Rights,* 13 Md. L. Rev. 83 (1953). The Court concluded:

> "We hold that the Farm Assessment Act attempts to set up a separate classification of *land* for tax purposes, that in so doing it contravenes the limitations upon classification contained in the present Article 15 of the Declaration of Rights and hence is unconstitutional." *Id.* at 563.

The appellants make the point that since the 1960 amendment to Art. 15 permitting the General Assembly to classify and subclassify land for assessment purposes only four subclasses have been created, "lands which are actively devoted to farm or agricultural use"; "woodland"; "lands actively devoted to use as a country club"; and "planned development lands." They contend that land devoted to service station use is not one of the permitted classifications. It is apparent that the appellants are under the impression that all land in a given area will carry the same assessment per square foot. We do not understand a subclassification as being created when the highest and best use of a property is taken into consideration in determining its present cash value. Physical characteristics of land will vary from lot to lot. The very size of a lot might well militate against its being used for certain purposes and suggest its use for other purposes. Good economics and good planning would dictate that there be some variation of use from lot to lot in a given area.

Valuation of land is not an exact science. Experts nearly always differ as to their opinion of fair market value. So long as the end result of the assessment process is conscientiously, fairly and honestly to bring the assessment of all land to the same percentage of fair market value, a taxpayer is hardly in a position to contend that there is discrimination. This gives reason to the

rule enunciated in *Rogan* that the fact an adjoining property owner might be assessed at a lower proportion of its value would not make the assessment invalid unless it was improperly made. Such a situation would contrast with that in *Sears, Roebuck v. State Tax Comm.*, 214 Md. 550, 136 A.2d 567 (1957), where, without statutory authority for differentiation, personal property and real estate were assessed at different percentages of their "full cash value." No such discrimination as in *Sears* was shown here. The fact that one lot was assessed at one figure per square foot and another lot at a different figure per square foot would not show discrimination in the absence of a showing that the two lots were in fact so similar in all respects as to be identical in value. For us to reverse on the ground of discrimination, it would be essential that there be some positive showing of discrimination as, for instance, the fact that other commercial property assessed at a lower figure per square foot in fact had a potential for service station use which had been ignored by the assessors. Such a showing might then be evidence of mistake, arbitrariness, or fraud, to use the language of *Rogan*. There has not been even the slightest intimation of lack of good faith upon the part of the taxing authorities here. Therefore, it can not be said that there has been conscious, arbitrary discrimination against the appellant.

We perceive no error of law in the decision by the Maryland Tax Court. It was not legally impermissible to use a capitalization of income approach in determining fair market value, a method long in use in Maryland, as the cases indicate. Likewise, the assessor did not legally err in valuing the land upon the basis of its highest and best use. Such valuation does not create a subclassification.

No discrimination having been shown, there being a factual basis for the determination of value, and the property not having been assessed in excess of its full cash value, it follows that there was no error.

*Order affirmed; appellants to*
*pay the costs.*