## WALTER L. SAMET ET UX. *v.* SUPERVISOR OF ASSESSMENTS OF BALTIMORE CITY

[No. 149, September Term, 1980.]

*Decided June 2, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Walter L. Samet* for appellants.

*T. Scott Basik* and *Peter W. Taliaferro, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

This is but yet another skirmish in the never ending battle on the part of taxpayers to reduce that which they are obliged to pay for the maintenance of their government. We shall here hold that the failure of tax assessors to obey the command of the General Assembly that they physically inspect all assessable real property at least once every three years does not invalidate an assessment conceded by the taxpayers to be correct in amount.

In 1978 appellants, Walter L. Samet and Naomi F. Samet, his wife, bought a home in Baltimore City for which they paid $69,000. The Supervisor of Assessments of Baltimore City valued the property for the 1979-80 tax year at $60,533. The date of finality was January 1, 1979. This was owner-occupied residential property. Hence, he assessed it for tax purposes at $27,240 (45% of $60,533) pursuant to Maryland Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 81, § 14 (b) (1). The Samets have protested the assessment through the various administrative bodies including the Maryland Tax Court. The tax court's determination was affirmed on appeal to the Baltimore City Court. An appeal was then entered to the Court of Special Appeals. We issued the writ of certiorari ex mero motu prior to consideration of the appeal by that court in order that we might address the important public question now before us.

Although conceding that their purchase of the home in question was an arm's length transaction, that the sum which they paid for it represented fair market value, and thus that this assessment made but a short time later was

correct in amount, the Samets seek to have their assessment reduced. They advance two reasons: (1) the fact that other homes in the area appear to be assessed at less than 45 percent of their "current value" on the date of finality, and (2) the failure of the tax assessor to physically inspect their property within the previous three years.

The mandate of Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 81, § 14 (b) (1) (i) is that real property "shall be assessed at its full cash value on the date of finality." The statute defines "full cash value" as "mean[ing] current value less an allowance for inflation of 50 percent of the current value." Section 14 (b) (1) (iii) then provides "a special allowance equal to 5 percent of the current value of the homestead property in recognition of the unprecedented increase in the value of homestead property due to inflation." Since enactment of Chapter 700 of the Acts of 1972, Art. 81, § 232 (8) (c) has required that assessable real property in every county and Baltimore City "shall be physically inspected for reassessment at least once in every 3 years." It is conceded that the assessing authorities failed to physically inspect subject property within that period. The last physical inspection was in 1975 for the 1976-77 tax year. The reasoning of the Samets in this regard seems to be that since physical inspection "at least once in every 3 years" is mandated, then the assessment must remain unchanged in the absence of such inspection.[1]

The command of Code (1957, 1958 Cum. Supp.) Art. 81, § 14 (b) (1) was that real property "sh[ould] be assessed at the full cash value thereof on the date of finality." It then went on to define that term as "current value less an allowance for inflation, if in fact inflation exists." The provision relative to the inflation allowance of 50 percent of the current value was added by Chapter 175 of the Acts of 1978, although by executive order that amount had been allowed previously. When Judge Henderson referred for the

---

1. The difference between the tax due on the assessment and that which the Samets say should be the assessment is said to be about $300. The Samets, each of whom is a member of the bar of this Court, are in a better position than the average individual to litigate over principle.

Court to "cash value" in *Bornstein v. State Tax Comm.,* 227 Md. 331, 337, 176 A.2d 859 (1962), he actually meant "current value," the figure from which the allowance for inflation was deducted to arrive at "full cash value." The Court there said that "[o]rdinarily the cash value would be the current market value, or what a willing purchaser would pay to a willing seller in the open market." *Accord, Fairchild Hiller v. Supervisor,* 267 Md. 519, 521, 298 A.2d 148 (1973), and *Weil v. Supervisor of Assess.,* 266 Md. 238, 246, 292 A.2d 68 (1972). Since the "current value" figure used by the assessor to reach the assessment here by adjusting for inflation and then allowing the additional reduction for a homestead is less than that which the Samets paid for the property in question within the preceding year and since they concede that what they paid represented fair market value, it follows that they have not been overassessed and they are entitled to no relief unless relief is to be accorded to them because their neighbors are underassessed or by virtue of the disobedience by the assessors of the direction of the General Assembly relative to physical inspection.

The consistent position of this Court has been as stated by Judge Delaplaine for the Court in *Rogan v. Commrs. of Calvert County,* 194 Md. 299, 71 A.2d 47 (1950):

> We accept the rule, as adopted in other States, that the assessment of the property of others at a lower proportion of its value than that of a complaining taxpayer, which is not assessed at more than its fair cash value, does not make the tax on the latter invalid, unless the assessment was fraudulently made. *Doty Lumber & Shingle Co. v. Lewis County,* 60 Wash. 428, 111 P. 562, Ann. Cas. 1912B, 870 [(1910)]. [*Id.* at 313.]

*Accord, Supervisor v. Southgate Harbor,* 279 Md. 586, 595, 369 A.2d 1053 (1977), and *Weil,* 266 Md. at 255. The Court pointed out in *Rogan,* citing *Sunday Lake Iron Co. v. Wakefield,* 247 U.S. 350, 38 S. Ct. 495, 62 L. Ed. 1154 (1918), and *Sioux City Bridge v. Dakota County,* 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923):

The purpose of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States is to protect every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the provisions of a statute or by improper enforcement of a statute. Intentional and systematic undervaluation by assessors of other taxable property in the same class violates the constitutional right of a person taxed upon the full value of his property. However, mere errors of judgment on the part of State or County officials in making assessments will not support a claim of such discrimination. There must be something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officials and the validity of their actions will be presumed. When their actions are assailed, the burden of proof is upon the complaining party. [*Id.* at 309-10.]

We repeated this language in *Southgate,* 279 Md. at 594. There has been no showing by the Samets of "an intentional violation of the essential principle of practical uniformity" here nor have they shown that the assessment was fraudulently made.

We likewise have said consistently that the remedy of one properly assessed who is offended by the underassessment of his neighbors is to seek an increase in the assessment of the neighbors. For instance, in *Steam Packet Co. v. Baltimore,* 161 Md. 9, 155 A. 158 (1931), Judge W. Mitchell Digges said for the Court:

Upon a full consideration of the contentions of the appellant, it would seem that its real complaint is that it is now taxed, while competitors are exempt, resulting in a pecuniary advantage to the competitors over it to the extent of the tax which it is required to pay. If this be true, its remedy lies, not in attempting to be relieved of the tax itself, but in

restraining the proper taxing officials from allowing the exemption to its competitors. Every taxpayer has a financial interest in seeing that all property in the state, properly the subject of taxation, should be taxed, because, by increasing the taxable basis, the rate necessary for the production of the expenses of the state and local governments will be reduced, and the individual's tax correspondingly lowered. [*Id.* at 22.]

Such action is authorized by Code (1957, 1975 Repl. Vol., 1978 Cum. Supp.) Art. 81, § 255. See *Tax Comm. v. Brandt Cabinet Works,* 202 Md. 533, 544, 97 A.2d 290 (1953), and *Rogan,* 194 Md. at 314. We are not blind to the normal reluctance of an individual to complain in this manner relative to his neighbors. We point out, however, that instances of such complaints have been known. *See, e.g., County Commrs. of A. A. Co. v. Buch,* 190 Md. 394, 58 A.2d 672 (1948). The complaining taxpayer there sought a hearing before the county commissioners pursuant to the statute. When they declined to grant him such a hearing, he sought the writ of mandamus to compel the hearing. This Court, in an opinion by Judge Henderson, affirmed the trial court's direction that the writ should issue.

The Samets rely on *Hirsch v. Md. Dep't of Nat. Resources,* 288 Md. 95, 416 A.2d 10 (1980), and *Garrett County v. Bolden,* 287 Md. 440, 413 A.2d 190 (1980), as "two recent cases that have struck down administrative actions where the mandatory language of the statute was not complied with making the administrative actions ineffective . . . ." Those cases are not apposite.

In *Bolden* the General Assembly had spelled out in precise terms in Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.) Art. 81, § 232C the exact procedures that must be followed by a county council or board of county commissioners as a prerequisite to levy of a tax rate in excess of that certified to it as the constant yield tax rate. We held that the failure to follow those procedures rendered the increase void.

In *Hirsch* the General Assembly had directed the Department of Natural Resources to record certain plats of

wetlands among the land records of the county. Judge Eldridge said for the Court:

> [T]he obvious purpose of the statutory requirement that the private wetlands maps and order be filed among the land records was to provide notice to a *prospective* purchaser that the real estate was subject to the private wetlands regulations, so that the prospective purchaser would have the opportunity to consider whether he would want to acquire the affected property under these conditions. [*Id.* at 114 (emphasis in original).]

Thus, we held that the litigant there was not bound by that concerning which he had no notice.

Since the assessment is conceded by the Samets to have been in the correct amount, it does not follow that the mandatory nature of this statute as a step in that assessment requires a lowering of the assessment. The purpose of the inspection is to arrive at a correct assessment, which purpose, by the concession, has been satisfied.

The fact that taxpayers may be irritated, justifiably, at the failure of the Department of Assessments and Taxation to follow the General Assembly's mandate relative to physical inspection simply is not a ground under the facts of this case for setting aside an otherwise correct assessment.[2]

*Judgment affirmed; appellants to pay the costs.*

---

2. We point out that we do not have before us the question of whether the assessing officials who failed to do as directed by the General Assembly may themselves be subject to some sanction for this disobedience nor do we have before us the question of whether a taxpayer by appropriate action could have compelled obedience to the law.