## SUPERVISOR OF ASSESSMENTS OF ALLEGANY COUNTY v. THE ORT CHILDREN TRUST FOUR

[No. 150, September Term, 1981.]

*Decided August 11, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Peter W. Taliaferro, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*James L. Thompson, Joseph V. Truhe, Jr.,* and *William Walsh* for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This appeal involves the 1979-80 assessment for real estate taxes of an income producing property. The property is saddled with a long term lease at a flat rent which was reflective of the market when the contract was made in 1962. Unique to this case is mutual agreement that in January 1979, the property could have commanded a rent more than twice that actually reserved under the lease, if the property had been available to be let at that time. The Maryland Tax Court acknowledged in its written opinion that it gave consideration to the actual rent in reducing the assessment as established by the supervisor of assessments for the county. In so doing, the assessor says the Tax Court erred as a matter of law. For reasons herein set forth, we shall conclude that there was no error.

The property involved is 4.373 acres of land, improved by a warehouse building, in LaVale, Allegany County. It is owned by The Ort Children Trust Four (the Trust). Predecessors in title to the Trust constructed the warehouse under a build and lease agreement of August 29, 1962 with Sears, Roebuck & Co. (Sears). The lease commenced in 1963 for an initial term of 20 years. Sears holds, at its option, the right to extend the lease for four additional terms, each of five years, under the same lease provisions applicable to the initial 20 year term. If all options are exercised, the right of Sears to occupy the property will extend to the year 2003.

The rent is a fixed amount, payable monthly, and totals $22,444.56 per year. Real estate taxes, public liability insurance, fire and extended coverage insurance and structural maintenance, including the roof, are the landlord's obligation at its expense. The rent established in 1962 converts to approximately $.55/s.f. (the contract rent).[1] It is conceded that as of January 1, 1979 comparable property rented for $1.25 to $1.75/s.f. (the economic rent).[2]

The Supervisor of Assessments for Allegany County (Supervisor) valued the land at $46,850 and the improvements at $292,000 as of the applicable date of finality, January 1, 1979. The improvements were valued by the cost of reproduction method, with a 41% depreciation allowance. This total valuation of $338,850 resulted in an assessment of $169,425 under the assessment to value ratio of 50%.

The Trust pursued its challenge of the assessment to the level of the Maryland Tax Court, where a real estate expert for the taxpayer testified that the value of the property was $80,000. His opinion utilized the contract rent and also reflected the cost to the owner of a new roof which the building required, for which an estimate of $68,500 had been received. This expert presented four variations of an income approach, all of which started with net rental income of

---

1. In his brief in this Court, the appellant sets forth from *Real Estate Appraisal Terminology* (Boyce ed. 1975) the following definitions of terms which we shall utilize in this opinion:

"CONTRACT RENT — Payment for the use of property as designated in a lease. Used to establish the fact that the actual rent designated, or contract rent, may differ from market rent." *Id.* at 50.

"ECONOMIC RENT — In appraisal practice, the term has traditionally been used as a synonym for 'market rental,' i.e., the rental income that a property would most probably command on the open market, as of the effective date of the appraisal. See Market Rent." *Id.* at 74.

"MARKET RENT — The rental income that a property would most probably command on the open market as indicated by current rentals being paid for comparable space (as of the effective date of appraisal). This is preferred terminology to the term 'Economic Rent' which has traditionally been used in appraisal analysis, even though both are currently considered synonymous." *Id.* at 136-137.

2. *See* n.1, *supra.*

approximately $18,000 per year, arrived at by deducting expenses representing insurance, maintenance, reserve for replacement, management, legal and accounting. All of his methods used a capitalization rate of 13.25%. In a direct capitalization approach the indicated value would be $69,600 if the cost of the roof were deducted from the product of capitalizing the net rent. If an amount required to amortize the cost of a new roof over a 20 year period at 10.5% were deducted from the net rent before capitalization, the indicated value would be $76,100. Taxpayer's expert then utilized the "Inwood" annuity approach and undertook to express the present worth of the right to receive the net contract rent for 24.5 years plus the value of the property at the end of the lease term, all discounted at 13.25%. A figure of $418,000 was used in this computation as the value of the property at the end of the lease term, based upon 1979 economic rent. If the cost of the roof were deducted from the product of discounting, the indicated value of the property would be $80,700. If amortized roof repair cost were deducted from the annual, net, contract rent before discounting to present worth, the "Inwood" approach would indicate a value of $90,200.

The assessor in the Tax Court presented, as a check on his cost of reproduction appraisal, an income approach to value. It utilized $1.25/s.f. as the gross rent. This was the lower end of the economic rent range. The lower end of that range was used because the assessor gave consideration to contract rent "to a certain extent." Net income was determined after deducting only for insurance. A return at 9.395% attributable to the land, at the assessor's land valuation, was computed and deducted from the net economic rent to determine that portion of the net economic rent attributable to the improvements. This in turn was capitalized at 11.395%. By this approach a total valuation of land and improvements of $401,220 was indicated to the assessor. This confirmed, in his opinion, the total assessment developed by the reproduction cost method.

The Tax Court reduced the assessor's valuation to $246,850 or, in dollars of assessment, to $123,425, effected

by a $46,000 reduction in the assessment on the improvements.

In its written opinion the Tax Court does not specifically set forth how its valuation was determined. It found, however, "that the present lease terms which specify the rent to be paid and other conditions should have been accorded more weight by the Supervisor and that this assessment appealed from should be reduced." The Tax Court also made the following findings:

> In the instant case, if any increment in value has occurred since the lease began in 1963, such increment has inured to the benefit of the [lessee], Sears, and the leasehold interest of the tenant is not subject to taxation in Maryland and what is taxed to the owner is the fair maket value of his property.

> No testimony has been introduced by the Supervisor to indicate that the rental entered into at the time of the lease's beginning in 1963 was not the proper rental as of that time.

> The value arrived at by the Supervisor is based upon a rent which does not exist and this valuation also fails to recognize the cost of replacing the roof which is the responsibility of the owner.

> The Petitioner's presentation is based upon facts, most importantly the lease rental and terms which would primarily control the purchase price this property could expect to produce if placed on the open market for sale.

The Supervisor appealed to the Circuit Court for Allegany County which affirmed the Tax Court. Appeal was taken by the Supervisor to the Court of Special Appeals. We granted the Supervisor's petition for a writ of certiorari prior to consideration of the case by the intermediate appellate court. As refined by oral argument in this Court, the position of the Supervisor is that the Maryland Tax Court could not, as a matter of law, give any consideration to the contract rent received by the Trust, because there was no dispute that the

contract rent was less than the economic rent on the date of finality.

Our task on this appeal is to determine whether the Circuit Court for Allegany County erred in affirming the Maryland Tax Court. The standard of review of Tax Court orders by a circuit court is set forth in Md. Code (1957, 1980 Repl. Vol.), Art. 81, § 229 (o):

> [T]he circuit court ... shall determine the matter upon the record made in the Maryland Tax Court. The circuit court ... shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. In other cases, the circuit court ... may affirm, reverse, remand, or modify the order appealed from.

By subsection (h) of § 229, the Maryland Tax Court

> is empowered to assess anew, classify anew, abate, modify, change or alter any valuation [or] assessment ... appealed from, provided that in the absence of any affirmative evidence to the contrary or of any error apparent on the face of the proceedings, the assessment ... appealed from shall be affirmed.

There is no contention in this case that the assessment made by the Maryland Tax Court is unsupported by the record, if the Tax Court could legally take the effect of the contract rent into consideration in arriving at its valuation. But for the legal point advanced by the Supervisor, this case would simply be the Tax Court resolution of a dispute over valuation.

Article 81, § 14 (b) (1) (i) provides that "[a]ll real property required by this article to be assessed shall be valued at its full cash value on the date of finality." Section 14 (b) (1) (ii)1 states that "[f]ull cash value means current value."

In *Schley v. Montgomery County,* 106 Md. 407, 410, 67 A. 250, 251-52 (1907), a case involving the valuation of shares

of stock, we said that "[t]he value of an article is ordinarily what it will bring at a fair sale in the market, unless it be of so special a nature that no market for it exists and then its intrinsic value must be ascertained by a consideration of its cost, nature, utility and other characteristics." Thereafter, when interpreting "full cash value" as applied to the assessment of real property for ordinary taxes, this Court said in *Rogan v. Commissioners of Calvert County,* 194 Md. 299, 311, 71 A.2d 47, 52 (1950):

> Ordinarily the cash value of property is the market value. *Schley v. Montgomery County Com'rs.,* 106 Md. 407, 410, 67 A. 250. But, as Justice White said in *San Francisco National Bank v. Dodge,* 197 U.S. 70, 25 S. Ct. 384, 386, 49 L. Ed. 669, the market value of property is the value a willing purchaser will pay for it to a willing seller in open market, eliminating exceptional and extraordinary conditions giving the property temporarily an abnormal value. The Court cannot rule as a matter of law that assessing authorities must be guided entirely by current market prices in making the assessments, regardless of how "thin" the "spot market" may be or how much it may be affected by conditions believed to be temporary and abnormal.

The willing purchaser-willing seller standard as the ordinary mode of measuring full cash value has been repeatedly enunciated. *See Samet v. Supervisor of Assessments,* 290 Md. 357, 359-60, 430 A.2d 73, 74 (1981); *Shell Oil Co. v. Supervisor,* 278 Md. 659, 666, 366 A.2d 369, 373-74 (1976); *State Department of Assessments and Taxation v. Greyhound Computer Corp.,* 271 Md. 575, 586, 320 A.2d 40, 45-46 (1974) (a tangible personal property tax assessment); *Fairchild Hiller Corp. v. Supervisor,* 267 Md. 519, 521, 298 A.2d 148, 149 (1973); *Weil v. Supervisor of Assessments,* 266 Md. 238, 246, 292 A.2d 68, 72 (1972); and *State Tax Commission v. Brandt Cabinet Works,* 202 Md. 533, 545, 97 A.2d 290, 295 (1953).

Furthermore, our cases have long recognized that capitalization of income is a relevant factor to be considered by the assessing authorities, particularly in assessing income producing properties. This is no more than a recognition of the reality that income producing properties are bought and sold on the basis of the income which they actually produce. *Bornstein v. State Tax Commission,* 227 Md. 331, 337, 176 A.2d 859, 861-62 (1962) makes the point through testimony given by the assessor in that case.

> The purpose is, of course, to ascertain the full cash value . . . . Ordinarily the cash value would be the current market value, or what a willing purchaser would pay to a willing seller in the open market . . . . Mr. Allen, Supervisor of Assessments for Montgomery County, testified that, based upon his long experience, he had found that a prospective buyer invariably considered income. "He always had to be shown the income, with his own determination of net, before he purchased. I have never heard of [an apartment house] being built without determining what income he would get, and that determines the value of the property as a whole." It is firmly established in this State that the relative weight to be accorded to any relevant factor in a particular case is for the assessing authorities and not for the courts.

In *Bornstein,* the assessment as finally determined by the then State Tax Commission resulted from a number of approaches to value, including the capitalization of gross contract income and, by utilizing exhibits relating to operating expenses, the capitalization of net contract income. In *Meade Heights v. State Tax Commission,* 202 Md. 20, 95 A.2d 280 (1953), the assessment under consideration in this Court concerned rental housing units built by the taxpayer on land leased by it from the United States. In addition to using the reproduction cost method, the assessors undertook to find value by capitalizing "the gross subrents received," *i.e.,* the contract rents paid by tenants of the

housing units. *Id.* at 31, 95 A.2d at 285-86. The assessment was affirmed.

Despite the uncontrovertible fact that a willing buyer of income producing property will look to the history of contract rent, and to the potential rent, whether contract or economic, in arriving at the price which he will pay for a given property, and despite the recognition in our cases of the use of contract rent in the income approach to valuation for assessment purposes, the Supervisor contends that there is a legal principle, operative here, which bars any consideration of contract rent because in this case it is undisputed that the contract rent on the subject property is below economic rent. We shall call that differential, as suggested by the Trust, the "leasehold advantage."

In support of his position, the Supervisor cites a number of decisions from other states.[3] Typically the cases relied upon by the Supervisor present an effort by the taxpayer to have a court reverse an administrative determination because the assessing authority is claimed either to have failed to give any weight to, or to have given insufficient weight to, contract rent. Illustrative is *Springfield Marine Bank v. Property Tax Appeal Board,* 44 Ill. 2d 428, 256 N.E.2d 334 (1970). There a circuit court reversed the administrative determination and adopted lower assessment figures arrived at through consideration of contract rent on

---

3. The Supervisor cites Clayton v. County of Los Angeles, 26 Cal. App. 3d 390, 102 Cal. Rptr. 687 (1972); Somers v. City of Meriden, 119 Conn. 5, 174 A. 184 (1934); Martin v. Liberty County Bd. of Tax Assessors, 152 Ga. App. 340, 262 S.E.2d 609 (1979); Springfield Marine Bank v. Property Tax Appeal Bd., 44 Ill. 2d 428, 256 N.E.2d 334 (1970); Donovan v. City of Haverhill, 247 Mass. 69, 141 N.E. 564 (1923); Crossroads Center (Rochester), Inc. v. Comm'r of Taxation, 286 Minn. 440, 176 N.W.2d 530 (1970); Demoulas v. Town of Salem, 116 N.H. 775, 367 A.2d 588 (1976); Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 297 A.2d 842 (1972); City of New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); In re Ernst, 58 Misc. 2d 504, 295 N.Y.S.2d 712 (1968), aff'd mem., 33 A.D.2d 655, 306 N.Y.S.2d 672 (1969); People ex rel. Gale v. Tax Comm'n, 17 A.D.2d 225, 233 N.Y.S.2d 501 (1962); In re Property of Pine Raleigh Corp., 258 N.C. 398, 128 S.E.2d 855 (1963); Swan Lake Moulding Co. v. Dept. of Revenue, 257 Or. 622, 480 P.2d 713 (1971); Kargman v. Jacobs, 113 R.I. 696, 325 A.2d 543 (1974); Yadco, Inc. v. Yankton County, 89 S.D. 651, 237 N.W.2d 665 (1975); Richmond, Fredericksburg and Potomac R.R. v. Commonwealth, 203 Va. 294, 124 S.E.2d 206 (1962).

long term leases which were unfavorable to the lessor. The Illinois Supreme Court reversed the circuit court and directed reinstatement of the administratively determined assessment. The court said (44 Ill. 2d at 430-31, 256 N.E.2d at 336):

It is clearly the value of the "tract or lot of real property" which is assessed, rather than the value of the interest presently held by the owner. In determining the value of the property, rental income may of course be a relevant factor .... However, it cannot be the controlling factor, particularly where it is admittedly misleading as to the fair cash value of the property involved. The relevance of rental income in this instance has been so diminished by the change in the property's value since the rents were established that it was properly disregarded. In such a situation, earning capacity is properly regarded as the most significant element in arriving at "fair cash value". As we have recognized in the past, many factors may prevent a property owner from realizing an income from property which accurately reflects its true earning capacity; but it is the capacity for earning income, rather than the income actually derived, which reflects "fair cash value" for taxation purposes .... After an extensive examination of this issue, the New York Supreme Court reached an identical conclusion, stating, "the existence of an outstanding lease at an unrealistically low rental for a long term, not representing the fair rental value of the property, is not to be used as a basis for calculating actual value. Thus, the true value of the property for assessment purposes is to be ascertained as if unencumbered by such a lease." *People ex rel. Gale v. Tax Commission of City of New York* (Sup.Ct. 1962), 17 A.D.2d 225, 233 N.Y.S.2d 501, 507.

This Court has held that earning capacity is properly

recognized in assessing property. In *Easter v. Department of Assessments,* 228 Md. 547, 180 A.2d 700 (1962), *appeal dismissed and cert. denied,* 371 U.S. 235, 83 S. Ct. 326, 9 L. Ed. 2d 495 (1963), vacant land was assessed comparably with adjacent income producing property. The taxpayer contended that, since he derived no income from his lot, its assessment should have been lower. Nevertheless we affirmed a determination that it was proper to assess on the basis of the income producing capacity of the taxpayer's property. In the instant matter, the property is utilized for producing income. Use as a warehouse is the site's highest and best use. The property's capacity to produce more income than that currently realized is impeded by the existing lease for years to come. The Maryland Tax Court recognized that this factor has some adverse effect on the market value of the property and took that factor into consideration in revising the assessment. The action of the Maryland Tax Court is entirely consistent with our decisions that permit the determination of full cash value to be made by reference to the willing purchaser-willing seller test.

Out of all of the cases cited by the Supervisor, *City of New Brunswick v. State Division of Tax Appeals,* 39 N.J. 537, 189 A.2d 702 (1963) is the only one in which the final assessing administrative authority utilized contract rent under a long term lease in fixing the assessment. On an appeal by the city, the matter was remanded to retry the issues of valuation. There the court said:

> The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller. Consideration may be given to cost less depreciation and sales of comparable property. It may also be given to rental income. [*Id.* at 543, 189 A.2d at 705.]

Then, in apparent support of the position of the Supervisor in this case, the court further said:

> The first problem is to find the fair rental value to which the capitalization rate will be applied . . . .

No doubt the fair rental value, rather than the actual rent payable under an existing lease, must control. *Somers v. City of Meriden,* 119 *Conn.* 5, 174 *A.* 184, 186-187, 95 *A.L.R.* 434 (*Sup. Ct. Err.* 1934), annotated 95 *A.L.R.* 442 (1935);[4] *People ex rel. Gale v. Tax Comm'n of City of New York,* 17 *A.D.2d* 225, 233 *N.Y.S.2d* 501, 506-507 (*1st Dept.* 1962).[5] True, the value of a parcel of property may in fact be affected by the prudence or imprudence of its owner, and so a long-term lease for an unfavorable rent will impair the selling price, just as a long-term lease to a triple-A tenant at a high rental may make the property more attractive to a buyer. But the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners. Adjacent properties of equal potential cannot be assessed differently because one proprietor was more or less astute than the other. [*Id.* at 544, 189 A.2d at 706.]

And *See Humble Oil and Refining Co. v. Borough of Englewood Cliffs,* 71 N.J. 401, 365 A.2d 929 (1976).

---

4. There is language in *Somers* which supports the Trust's position in the instant case.

The fact that property is under lease is a relevant and, if for an extended term, an important consideration. Leases soon to expire or tenancies at will, involving possibilities of early vacancies or lowering of rents, or long-term leases at rentals inadequate when measured by prevailing standards tend to impair, and, equally, leases having a long term yet to run and reserving relatively high rents measurably appreciate, present value. [119 Conn. at 11, 174 A. at 187.]

5. In *Gale,* the court said:

Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining "the full value" of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is . . . . But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly. [17 A.D.2d at 230, 233 N.Y.S.2d at 506-07.]

The other extreme is presented in a Michigan decision, *C.A.F. Investment Co. v. Saginaw Township,* 410 Mich. 428, 302 N.W.2d 164 (1981). The tax statute involved there defined cash value to mean, in essence, the usual selling price on the open market, taking into account various factors including the "present economic income of structures." A lease of the property for department store purposes, made in 1963 at a then economic rent, was expected to run until 1998. The tax year involved was 1971. Previously the court had reversed an assessment that was based on 1971 economic rent because it relied "upon a hypothetical rental income without consideration of actual rental income demonstrably related to fair market value." *C.A.F. Investment Co. v. State Tax Commission,* 392 Mich. 442, 455, 221 N.W.2d 588, 594 (1974). After that remand, the tax tribunal again failed to use contract rent and the matter came back to the Michigan Supreme Court for its 1981 decision. The court held that its prior decision "left no doubt that 'economic income' meant nothing other than actual income" under the circumstances of that case, and directed the tax tribunal to enter assessments in accordance with the figures computed by the court. 410 Mich. at 458, 302 N.W.2d at 171.

In a dissenting opinion, Justice Moody of the Michigan high court classified decisions involving tax assessments on property encumbered by a long term, unprofitable lease as presenting one of three analyses (*id.* at 495-96, 302 N.W.2d at 185):

> First, there is a minority of jurisdictions which absolutely rejects the use of actual income but rather relies on the full potential earning capacity of the land regardless of the lease. [cit. om.]
>
> The second group, which comprises the majority of courts, permits the consideration of actual income along with full potential earning capacity in determining the value of property. These courts, however, place little emphasis on actual income and allow actual income to be disregarded in most cases in favor of earning capacity. [cit. om.]

The third group of jurisdictions, found in older decisions, places substantial emphasis on the actual earnings from the encumbered property. But even these courts . . . allow the consideration of "earning capacity" and do not wholly denigrate the cost of reproduction or market approaches to valuation. [cit. om.]

We agree that it is the minority position to reject completely any use of contract rent in cases like that under consideration. We decline to adopt the minority view. Even where a leasehold advantage is admitted, the analysis which prohibits any consideration of contract rent is at odds with the willing seller-willing purchaser approach to market value for property tax purposes.

This conclusion is reinforced by Art. 81, § 14 (e) (Ch. 818 of the Acts of 1978), which was in effect on the date of finality here involved. The legislation was one of the products of the Tax Assessments Study Task Force, appointed pursuant to Joint Resolution No. 33 of the 1977 session of the General Assembly. 1977 Md. Laws 3716. In its 1977 interim report to the Maryland General Assembly, at p. 7, the task force said:

The Committee reviewed the capitalization of income approach which is one method which can be utilized in assessing income producing properties. The Committee learned that the Department of Assessments and Taxation has experienced difficulty in effectively utilizing this assessment method because of problems in obtaining income and expense information on commercial properties. Thus, the Department often has no choice but to use an alternative assessment method or to use the income capitalization approach based upon estimated income data.

The reference to the use of "estimated" income data, where the contract rent of a particular property was unknown, must be taken to mean a figure derived from the contract

rentals, known to the assessors, of comparable property, and not to mean a simply arbitrary figure.

The bill proposed by the task force, after amendment in the course of passage, became Art. 81, § 14 (e) which in 1979 read:

> (e) *Valuation of income producing property.* — In determining the value of real property which produces *income,* except for agricultural use property, all assessing authorities may value the property by means of the capitalization of *income* method, in addition to any other appropriate method of valuing the property. The assessing authority shall notify all taxpayers of this property to complete, under the penalty of perjury, by not later than July 15, an *income* and expense statement for the property, on a form prepared by the State Department of Assessments and Taxation. In lieu of the statement, the assessing authority may accept the most recent annual *income* and expense statement of the taxpayer when it is verified as to accuracy and completeness by the taxpayer under penalty of perjury. Under either method, the assessing authority need not accept the expenses or depreciation claimed by the taxpayer and may use other appropriate methods to determine correct expenses and/or depreciation. In case of the failure of a taxpayer to file the *income* and expense information after having been notified, the taxpayer may not appeal the decision of an assessing authority in valuing the property on the basis of the capitalization of *income* method in lieu of any other method of valuation.[6] [Emphasis added.]

---

**6.** As introduced, the title of the bill stated a purpose of "requiring" consideration of a capitalization of income method. This was amended to a purpose of "permitting" that consideration. In the first sentence of subsection (e), preceding "value," "shall" was amended to read "may." Ch. 818 of the Acts of 1978.

"Income," in this statute, when referring to that produced by the property and to that presented in financial statements, is unmistakably contract rent. There is no purpose in having assessors obtain actual figures unless the intent is that contract rent may be used in an income capitalization approach to value. It would be inconsistent with this general legislative policy for us to hold, simply because contract rent is admittedly below economic rent, that the Maryland Tax Court, as the highest assessing authority, is legally prohibited from considering contract rent at all, in spite of that agency's conclusion that the contract rent does in fact have some effect on value in this case.

The Supervisor, however, contends that because the subject property involves an admitted leasehold advantage, total disregard of contract rent in assessing it is compelled by other statutory provisions found in Article 81. The argument runs this way. Article 81, § 2 (12) provides that, as used in that article, "[r]eal estate shall include leaseholds, unless such construction would be unreasonable." Article 81, § 8 provides:

> The following property . . . shall be subject to assessment to the owner . . . and taxation for ordinary taxes . . . .
>
> (1) *Real property.* — All real properties in this State, by whomsoever owned, including that owned or leased by the United States . . . *to the fullest extent possible* under the Constitution of the United States and laws of the United States pursuant thereto and in conformity therewith . . . . (Emphasis added.)

Article 81, § 14 (b) (1) (i) provides that

> [a]ll real property required by this article to be assessed shall be valued at its full cash value . . . .

From this the Supervisor concludes that the leasehold here is considered as part of the real estate assessed to the Trust,

as owner. We agree.[7] Then, says the Supervisor, in order to assess the leasehold included in the real estate "to the fullest extent possible," economic rent must be the rent used in capitalizing income and lower contract rent must be disregarded. Otherwise, the leasehold advantage goes partially untaxed.

Article 81, § 8 (1) does not express a standard of valuation. The "fullest extent possible" language is intended to exercise, up to the very limit imposed by constitutional prohibition, the power of Maryland to tax the interest of a private person who is in possession of federally owned property, where Maryland law undertakes to make the interest of that person subject to ordinary taxation. See, *e.g., Meade Heights v. State Tax Commission, supra.* Nor can the tax statutes be construed as impliedly compelling the total rejection of any weight being given to contract rent in this case in the face of Art. 81, § 14 (e), discussed above.

More fundamentally, both the leasehold and the reversion have been assessed by the Tax Court to the Trust, as owner. That assessment represents the Tax Court's judgment of full cash value. To say that part of the property interest has been left unassessed assumes the conclusion that the full cash value of the property is higher than that found by the Tax Court. The Supervisor's arguments that the assessment has resulted in a partial exemption, or in an invalid subclassification for properties burdened by disadvantageous leases, similarly beg the question.

It should be pointed out that the lease between Sears and the Trust was an arms length, bona fide transaction and that it is agreed between the parties that the rent as originally established was an economic rent at the time. Thus we are not concerned here with the effect which a difference in those factors might produce in some other case.

The Maryland Tax Court made no error of law in modifying the assessment. The Circuit Court for Allegany

---

7. This case does not involve Art. 81, § 8 (7).

County properly affirmed the order of the Maryland Tax Court.

> *Judgment of the Circuit Court for Allegany County affirmed.*
> *Costs to be paid by the Supervisor of Assessments for Allegany County.*