622 A.2d 786

**SUPERVISOR OF ASSESSMENTS OF BALTIMORE CITY**

v.

**HAR SINAI WEST CORPORATION.**

**No. 1143, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

April 6, 1993.

632

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Virginia W. Barnhart (Douglas B. Riley and Miles & Stockbridge, on the brief), Towson, for appellee.

Argued before CATHELL, DAVIS and MOTZ, JJ.

MOTZ, Judge.

This case presents questions of whether a building, constructed with HUD financing, owned by a non-profit corporation, and used exclusively for low income housing is entitled to an exemption from Maryland real property taxes

and, if not, how that property should be valued for tax purposes.

(i)

■ Har Sinai West Corporation requested an exemption from property taxes on a low income highrise apartment building for the elderly and handicapped that it owns and operates in Baltimore City. Har Sinai, a non-profit corporation, constructed the subject apartment building with a 100% loan from the United States Department of Housing and Urban Development (HUD) under the National Housing Act of 1959. The initial mortgage loan for $4,411,100 at 9.25% interest for 40 years was obtained from HUD on August 24, 1981. In addition to its HUD financing, the apartment building is operated through tenant rent payments and federal rent subsidies. Because of the extensive involvement by the federal government, both through financing and rent subsidies, the apartment building is subject to several restrictions. For example, HUD establishes eligibility requirements for tenants and controls rent. HUD also imposes other operational and maintenance restrictions on the apartment building, such as requiring Har Sinai to fund a reserve replacement fund in order to finance repairs to the building. Furthermore, although the HUD mortgage may be assumed, its transfer to another mortgagee is subject to HUD approval.

The Supervisor of Assessments of Baltimore City (Supervisor) denied Har Sinai's request for a real property tax exemption and valued the property at $4,361,250. Har Sinai appealed both the denial of the exemption and the valuation to the Property Tax Assessment Appeals Board for Baltimore City where the denial was affirmed, and the value was reduced to $3,987,400. Har Sinai then appealed both issues to the Maryland Tax Court. The Tax Court affirmed both the denial of the exemption and the value assigned by the Property Tax Assessment Appeals Board, i.e., $3,987,400.

Har Sinai appealed the order of the Tax Court to the Circuit Court for Baltimore City. The circuit court affirmed

the denial of the exemption but remanded the determination of the property value to the Tax Court. The Supervisor appeals the valuation question to this Court; Har Sinai cross-appeals the circuit court's order affirming the denial of the exemption. At issue in this appeal then is whether the Tax Court erred in denying Har Sinai's request for exemption and, if not, whether the Tax Court erred in its valuation of the subject property.[1]

(ii)

We first consider whether the denial of Har Sinai's request for an exemption from property taxation was proper. Har Sinai contends that "the subject property is exempt from property taxation under the clear import of section 7–202" of the Tax–Property Article of the Maryland Annotated Code. *See* Md.Code Ann.Tax Prop. § 7–202 (1986).[2] The Supervisor asserts (1) that another section of the Tax–Property Article, § 7–502, pursuant to which Har Sinai is clearly not entitled to any exemption, is controlling here and (2) that even if § 7–202 were applicable, Har Sinai does not qualify for an exemption under it.

---

**1.** These two issues reflect the essence of the questions presented by appellant, Supervisor, and cross-appellant, Har Sinai, in this appeal. Specifically, the Supervisor asks:

 1. Did the circuit court misapply the appropriate standard of review and substitute its factual conclusions for that of the tax court?

 2. Was the order of the tax court affirming the value of the subject property supported by substantial evidence in the record and correct as a matter of law?

Har Sinai, in its cross-appeal, presents the following questions for review:

 1. Did the circuit court err, as a matter of law, in affirming the tax court's decision that the subject property was not exempt from real property taxation?

 2. Did the circuit court err in failing to adopt the valuation opinion of Har Sinai's expert when the methodology used by the supervisor's expert in valuing the property was clearly flawed?

**2.** All references hereinafter are to Md.Code Ann.Tax Prop. unless otherwise specified.

The statute relied upon by the Supervisor, § 7–502, was initially enacted in 1966 to authorize "political subdivision[s] of the State to enter into agreements ... with non-profit institutions ... for payments in lieu of taxes on real property owned by such institutions ... where the real property is used to provide rental housing facilities exclusively to elderly or handicapped families on a nonprofit basis." 1966 Md.Laws, Chap. 201 pmbl. Thus, § 7–502 is specifically designated to address the tax status of property like the building at issue here, *i.e.*, multifamily residential apartment buildings for the elderly and handicapped, that are constructed with federal loans and operated on a nonprofit basis.

Section 7–502 provides in pertinent part:

(a)(2) Real property that meets the requirements of subsection (b) of this section is not subject to property tax if:

(i) the owner of the real property is:

1. a person who meets the ownership requirements of § 7–202 of this title; or

2. a nonprofit corporation that is exempt from income tax under § 10–104 of the Tax–General Article; and

(ii) the owner of the real property is engaged solely in constructing, operating, or managing multifamily rental housing and other related essential service facilities that:

1. are newly constructed on and after September 24, 1959;

2. are financed for at least 95% of the cost from loan funds provided under the National Housing Act of 1959 for senior citizen housing programs; and

3. are operated on a nonprofit basis with the revenues from the operation of the housing and facilities controlled by the loan program in order not to produce any net income.

(b) Procedure for exemption. The real property described in subsection (a) of this section may be exempt from property tax only if:

(1) the governing body of the subdivision where the real property is located approves an agreement between the subdivision and the owner; and

(2) under the agreement the owner pays the subdivision a negotiated amount in lieu of property tax.

Har Sinai, the owner of the property, meets most of the requirements for preferred tax status set forth in § 7–502. It is a nonprofit housing corporation and, thus, exempt under § 10–104. It is able to meet the ownership requirements of § 7–202 so it clearly meets the requirements of § 7–502(a)(2)(i). Its sole purpose is the ownership and operation of the subject property, which was built in the early 1980's with 100% financing provided under the National Housing Act of 1959, so it meets the requirements of § 7–502(a)(2)(ii)(1) and (2). Moreover, the subject property is operated under a Regulatory Agreement and a Housing Assistance Payment Contract, which regulate the project in order to make it nonprofit, so it meets the requirements of § 7–502(a)(2)(ii)(3). There is, however, one more requirement that must be met in order to obtain a favored tax status under this statute. Section 7–502(b) provides that property meeting the criteria set forth in subsection (a) may be exempt *"only if"* a Payment in Lieu of Taxes Agreement (PILOT) is received from the local subdivision. It is undisputed that Har Sinai has never requested or received a PILOT and, therefore, cannot be exempt under § 7–502. The Supervisor argues that the General Assembly granted local jurisdictions the discretion to enter (or not enter) into a PILOT and that this discretion would be undercut if a denial of a request for a PILOT or a failure to request a PILOT would allow a taxpayer to resort to another statute for a total exemption. There is much force to the Supervisor's argument. We need not reach it here, however, because even if Har Sinai can employ § 7–202, it is still not entitled to an exemption.

Section 7–202 provides in pertinent part:

(b) Requirements for exemption.—(1) Except as provided in subsection (c) of this section, property is not subject to property tax if the property:

- (i) is necessary for and actually used exclusively for a charitable or educational purpose to promote the general welfare of the people of the State, ... and

(ii) is owned by:

\* \* \* \* \* \*

4. a nonprofit housing corporation.

There is no dispute that the property meets the ownership requirements of § 7–202(b)(1)(ii)(4), that is, the property is owned by Har Sinai, a nonprofit housing corporation. As Har Sinai asserts, "the only question which remains about the applicability of Section 7–202 is whether Har Sinai's laudable purpose is a 'charitable' one which promotes the general welfare of the people of Maryland." The Court of Appeals, in interpreting Md.Ann.Code art. 81, § 9(e),[3] the predecessor to Tax Prop. § 7–202, has instructed that a determination of an organization's charitable status focuses on four factors.

[It] must include a careful examination of [1] the stated purposes of the organization, [2] the actual work performed, [3] the extent to which the work performed benefits the community and the public welfare in general, and [4] the support provided by donations.

*Super. of Assessments v. Group Health Assoc., Inc.*, 308 Md. 151, 157, 517 A.2d 1076 (1986). Har Sinai concedes that this four factor test is applicable here.

_____

3. Md.Ann.Code art. 81, § 9 (1980) provided in pertinent part:
The following real and tangible personal property are exempt from ... taxation ...:
(e) ... Property owned by ... any nonprofit charitable, fraternal or sororal, benevolent, educational, or literary ... organizations ... when ... *actually used exclusively for and necessary for charitable, benevolent, or educational purposes ... in the promotion of the general public welfare of the people of the State.*
(emphasis added).

Whether this test has been met is a question of fact, or an application of law to the facts, and therefore the substantial evidence test applies. *See Super. of Assessments v. Asbury Methodist Home, Inc.,* 313 Md. 614, 627, 547 A.2d 190 (1988); *Group Health,* 308 Md. at 159, 517 A.2d 1076. Our standard of review, then, is one of deference—we must determine "whether a reasoning mind, having a proper understanding of the relevant law, could have reached the conclusion reached by the Tax Court." *See Asbury Methodist Home,* 313 Md. at 627–28, 547 A.2d 190. Any exemption from taxation is to "be strictly construed in favor of the State," *Super. of Assessments of Baltimore Cty. v. Bosley Methodist Church Graveyard,* 293 Md. 208, 212, 443 A.2d 91 (1982), and this rule is "not relaxed in favor of charitable or benevolent institutions." *Lodge No. 817, Trustees Benev. & Protective Order of Elks v. Super. of Assessments of Wicomico Cty.,* 292 Md. 533, 538, 439 A.2d 591 (1982).

With these principles in mind, we turn to the Tax Court's decision in this case. As in *Group Health* and *Asbury Methodist,* the facts here are undisputed. What is very much disputed is whether the Tax Court properly applied the law to the facts. Although the Tax Court denied Har Sinai's request for tax exemption on the theory that § 7–502 "provides exclusive relief from taxes in the subject property," it also found that, even if § 7–202 was applicable, no exemption was proper. The Tax Court initially focused on the first three factors set forth in *Group Health*—stated purposes, actual work performed and extent to which that work benefits the public welfare in general. With regard to them, the Tax Court reasoned that "the mere providing of housing to senior citizens, or the provision of non-profit housing is not sufficient to entitle a taxpayer to an exemption under § 7–202. 7–202 requires that the property actually be used exclusively for and necessary for charitable purposes, to promote the general welfare of the people of the State of Maryland." The Court

then found "as a matter of fact ... that the property is not actually and exclusively used for charitable purposes."

It is uncontroverted that Har Sinai, in addition to operating and maintaining the subject property, performs only minimal other services, most of which are only for its tenants. Accordingly, Har Sinai cannot and does not assert that it provides, let alone exclusively provides, in the subject property, some charitable services, other than non-profit housing, that would qualify the property for tax exempt status. Rather, Har Sinai's only response to the finding of the Tax Court seems to be that the Tax Court erred because the plain language of the statute contains no such provision. Har Sinai is correct that § 7–202(b)(1) does not expressly state that "provision of non-profit housing alone is not sufficient to entitle a tax payer to an exemption" but the statute does provide that in order to receive an exemption, property must not only be used exclusively for a charitable purpose but also exclusively for a charitable purpose which will "promote the *general* welfare of the people of the State." (emphasis added)

Moreover, in *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 525 A.2d 628 (1987) and its progeny, the Court of Appeals made it clear that when pursuing the meaning of statutory language, a court is "not limited to the words of the statute as they are printed in the Annotated Code." 309 Md. at 514–15, 525 A.2d 628. *See also Wynn v. State*, 313 Md. 533, 539, 546 A.2d 465 (1988); *Martinez v. Lopez*, 300 Md. 91, 102, 476 A.2d 197 (1984); *McAlear v. McAlear*, 298 Md. 320, 343 n. 25, 469 A.2d 1256 (1984); *Skinner v. First United Church*, 88 Md.App. 434, 439, 594 A.2d 1245 (1991). Rather, a court "may and often must consider ... its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose;" legislative history, thus, "becomes the context within which" a court reads "the particular [statutory] language ... in a given case." *Id.* at 515, 594 A.2d 1245.

■ In this case, the legislative history is indeed telling. The statutory predecessor of § 7–202 expressly provided:

In the case of a nonprofit housing corporation this exemption shall not extend to the property of the nonprofit housing corporation *based solely on the fact that it is a nonprofit housing corporation;* but rather, on the fact that the corporations' *property is, in fact, devoted to a charitable, benevolent, educational or general public welfare purpose.*

*See* Md.Ann.Code art. 81, § 9(e) (1980), superseded by Tax Prop. § 7–202 (emphasis added). This sentence was omitted in the recodification of the tax provisions of the Code into the Tax Property Article in 1985. The revisor's note for § 7–202, however, indicates that the new language was "derived without substantial change from former Art. 81, § 9(a) and (e)" and that the "reference that sets out the purposes for which property owned by a nonprofit housing corporation must be used in order to qualify for an exemption is deleted in light of the requirement of subsection (b)(1)(i) of [§ 7–202]." *See* § 7–202, Revisor's Note. In interpreting similar statutory revisions and explanatory revisor's notes, the Court of Appeals has expressly held that a change in the phraseology of a statute does not modify the law since the legislative intent to do so is not, in these circumstances, "unmistakable." *See, e.g., Office & Prof. Employees Int'l Union v. Mass Transit Admin.,* 295 Md. 88, 100, 453 A.2d 1191 (1982); *Bureau of Mines v. The George's Creek Coal and Lumber Co.,* 272 Md. 143, 155, 321 A.2d 748 (1974); *Allers v. Tittsworth,* 269 Md. 677, 683, 309 A.2d 476 (1973). Thus, the Tax Court properly applied the law to the undisputed facts in finding that merely providing "non-profit housing is not sufficient to entitle a tax payer to an exemption under § 7–202."

The Tax Court then focused on the remaining factor to be considered in determining whether an exemption under § 7–202 was appropriate, *i.e.,* whether support was provided by donations, and found:

The subsidy, the Court finds is coming from the federal government and not from the taxpayer, and consequently even under 7–202 the taxpayer could not prevail.

This finding also reflects the Tax Court's understanding of the applicable law and is supported by substantial evidence. The undisputed evidence was that Har Sinai received no private donations to support the operation of the apartment building. Rather, it was uncontroverted that the apartment building was funded entirely by federal subsidies and rent paid by tenants. The federal subsidies are made pursuant to the Housing Assistance Payments Contract executed between HUD and Har Sinai. Each tenant's contribution is calculated based on 30% of his net income, which is gross income adjusted for medical expenses and other expenses. Any difference between the total rent and the tenant's contribution is paid by HUD. In addition, HUD pays the entire rent during periods of vacancy.

■ The question of whether similar federal government subsidies may be considered "donations" for the support of a property for which a charitable exemption is claimed is one of first impression in Maryland. Relevant case law in other jurisdictions suggests that the Tax Court's conclusion, that they do not, was correct.[4]

---

**4.** In contrast, in each of the out-of-state cases relied upon by Har Sinai, the principal statutory or constitutional requirement for tax exempt status was simply that a bona fide charity *use* its property exclusively for charitable or non-profit purposes. *See, e.g., Yorgason v. County Bd. of Equalization,* 714 P.2d 653, 660–661 (Utah 1986) (statute provides that property "used exclusively ... for charitable purposes ... shall be exempt from taxation;" whether funds are federal subsidies or private charitable donations is irrelevant concern if "use" of property is charitable); *Senior Citizens Housing Devel. Corp. v. City of Claremont,* 122 N.H. 1104, 453 A.2d 1307, 1309 (1982) (statute provides for exemption if property is owned by charitable organization and is occupied and used by it directly for the purposes for which it was established); *Glass v. Okla. Methodist Home for the Aged, Inc.,* 502 P.2d 1268, 1270 (Okla.1972) (constitution provides that "property used exclusively for ... charitable purposes" was tax exempt); *Memorial Hospital v. Sparks,* 9 Ariz.App. 478, 480, 453 P.2d 989, 991 (1969) (statute provides property of charitable institutions "not used or held for profit" is exempt; charitable exemption "de-

For example, in *Waterbury First Church Housing, Inc. v. Brown,* 170 Conn. 556, 367 A.2d 1386 (1976), the court considered a nonprofit housing corporation's appeal of the tax commission's denial of its request for exemption from a sales and use tax. In holding that denial of an exemption was proper, the Connecticut Supreme Court focused on the fact that the housing corporation received no charitable donations and derived its income entirely from tenant rent contributions and federal rent subsidies. *Id.* 367 A.2d at 1390. The *Waterbury* Court reasoned that "[a]n institution must be exclusively charitable, not only in the purposes for which it is formed but also in *the manner and means* it adopts for the accomplishment of those purposes.... [A]n essential characteristic of a charitable organization ... is that it achieve its purpose 'through the means of funds, derived from the *gratuities of the benevolent.*'" *Id.* at 1389 (citations omitted) (emphasis added).

Another case that is especially noteworthy is *Yakima First Baptist Homes, Inc. v. Gray,* 82 Wash.2d 295, 510 P.2d 243, 246 (1973) in which the Supreme Court of Washington held that a federal rent subsidy could not be considered a public donation or private charity as used in the state's property tax exemption statute. The governing statute required that an exempted property be supported "in part by public donations or private charity." *See id.* 510

---

pends solely upon the use made of the property"); *Belle Harbor Home of the Sages v. Tishelman,* 100 Misc.2d 911, 420 N.Y.S.2d 343, 345 (1979), *aff'd,* 81 A.D.2d 886, 441 N.Y.S.2d 413 (1981) (statute provides for exemption if charity/owner is "organized exclusively" for charitable purposes and no "pecuniary profit inures to the owners, officers, members, or employees nor is the property used as a guise for profit-making operations"). Other jurisdictions not identified by Har Sinai have held similarly. *See Rolla Apartments v. State Tax Commission,* 797 S.W.2d 781, 792 (Mo.Ct.App.1990) (charitable exemption is granted if property is "actually and regularly used exclusively for ... purposes purely charitable"; federal subsidization rather than private charitable contributions "does not dictate a different result"); *Public Housing Assistance, Inc. v. Havill,* 571 So.2d 45, 47 (Fla.Dist.Ct.App. 1990), *rehearing denied,* 581 So.2d 164 (Fla.1991) (exemption turns on whether property is operated for a "charitable purpose"; "the receipt of federal funding is irrelevant to its charitable status").

P.2d at 245. A nonprofit corporation sought to have a twelve story apartment building for the elderly declared exempt from property taxes. The primary source of funds for the construction of the building was a loan from the federal government. The building was operated and maintained "almost entirely from rents and rent subsidies" while "[t]he amounts received from contributions appear[ed] . . . to be extremely small." *Id.* at 246. The Washington Supreme Court refused to consider federal rent subsidies as donations because, as here, the subsidies were paid pursuant to a contract between the apartment building and the federal government.

See also *Better Living Services v. Bolivar Cty.*, 587 So.2d 914, 917 (Miss.1991) (nonprofit corporation operating low cost apartments not a "charitable society" entitled to exemption when corporation received all income from HUD or tenant rent); *G.D.L. Plaza v. Council Rock School District*, 515 Pa. 54, 526 A.2d 1173, 1177–78 (1987) (property is exempt from taxation if, *inter alia*, it is "funded, endowed, and maintained by public or private charity"; federal rent subsidies provide compensation, but are not public or private charity); *Dow City Senior Citizens Housing, Inc. v. Board of Review of Crawford Cty.*, 230 N.W.2d 497, 499 (Iowa 1975) (nonprofit corporation operating law rent housing facility in which rent was subsidized by FHA was not "charitable or benevolent institution" entitled to exemption); *Oea Senior Citizens, Inc. v. Douglas Cty.*, 186 Neb. 593, 185 N.W.2d 464, 470 (1971) (retirement home operated by nonprofit institution not entitled to exemption; "merely because [the institution] caters to the needs of the aged and infirm, [does not mean it] should be exempt from taxation if someone other than that institution is furnishing the cost of the care and maintenance provided by the institution."); *Clark v. Marian Park, Inc.*, 80 Ill.App.3d 1010, 36 Ill.Dec. 241, 244, 400 N.E.2d 661, 664 (1980) (one factor that must be present in order for charitable organization to qualify for exemption is that "funds are derived mainly from private and public charity"; low income housing project did not

qualify for exemption because it was funded primarily by tenant rent payments and federal subsidies); *Parker v. St. Stephen's Urban Development Corp., Inc.*, 243 N.J.Super. 317, 579 A.2d 360, 366 (App.Div.1990) (low income housing property denied charitable immunity because church that owned property "did not undertake to create low and moderate income housing ... through its own efforts either by dedication of church funds or the establishment of a program of charitable solicitation...., the Church merely created a conduit for federal mortgage money and for federal rent subsidies.")

In sum, the Tax Court's finding that Har Sinai does not qualify for an exemption under § 7–202 was legally correct and is supported by substantial evidence. Accordingly, the circuit court's order affirming that decision was entirely proper.

(iii)

 Having concluded that the Tax Court did not err in denying Har Sinai's request for exemption, we now turn to the issue of valuation. The value of real property for assessment purposes is "its value on the date of finality." Tax Prop. § 8–102(a). "Value," according to the Code, is "the full cash value of the property." Tax Prop. § 1–101(11). Generally, "assessors have reasonable latitude in selecting a method of valuation, so long as they assess the property at its full cash value." *Verkouteren v. Super. of Assessments,* 38 Md.App. 216, 222, 380 A.2d 642 (1977); *see Macht v. Dept. of Assessments,* 266 Md. 602, 608, 296 A.2d 162 (1972). The choice of a particular method of valuation is a question of fact for which we will defer to the expertise of the taxing agency. *See Bornstein v. State Tax Commission,* 227 Md. 331, 337, 176 A.2d 859 (1962); *Weil v. Super. of Assessments,* 266 Md. 238, 251–254, 292 A.2d 68 (1972); *Super. of Assessments v. St. Leonard Shores Jt. Venture,* 61 Md.App. 204, 210, 486 A.2d 206 (1985), *aff'd,* 307 Md. 441, 514 A.2d 1215 (1986). Thus, as with the first issue, a court must affirm the order of the Tax Court as to valuation if it

determines that "a reasoning mind, having a proper understanding of the relevant law, could have reached the conclusion of the Tax Court." *See Asbury Methodist Home,* 313 Md. at 628, 547 A.2d 190; *Fairchild Hiller Corp. v. Super. of Assessments,* 267 Md. 519, 521, 298 A.2d 148 (1973).

■ The Tax Court, affirming the decision of the Property Tax Appeals Board, valued the subject property at $3,987,400.[5] The circuit court remanded this issue to the Tax Court for further consideration on the theory that the Tax Court failed to articulate how and to what extent "significant value influences" affected the valuation of the

---

5. In ruling on the valuation issue, the Tax Court found:

The property that—the subject property ... is a hundred and nine unit high rise apartment; has a mortgage of Four Million Four Hundred and Eleven Thousand, permanent mortgage, at nine and a quarter percent, forty years, which can be assumed.... [T]his property has a date of finality of 1/1/89.

The property is a HUD property. It's non-profit, with a guaranteed rent. The value appealed from is Three Million Nine Hundred Eighty-seven Thousand Four Hundred Dollars. The highest and best use of the property as of the date of finality is [its] present use as a HUD project.

The Court finds that the market for this type of property is a non-profit housing corporation. The sale of this property ... is limited to a non-profit housing corporation. We expect that in deciding on a purchase price, the income stream of this property is an appropriate consideration in that the financial liability is necessary to promote the charitable purpose.

The property produces income, and the measurement of this income, I believe, provides a basis for valuation. The difference between the parties is substantial, almost Three Million. And it appears to result in part from Petitioner's consideration of the debt service as a part of their expert's income analysis methodology.

I am not convinced that the Supervisor's methodology is flawed, or that a value of Three Million Nine Hundred and Eighty-seven Thousand Four Hundred Dollars is incorrect.

The actual income and expenses were used. And the cap rate appears to be reasonable, considering the security of the income stream. It is considered as an acceptable appraisal practice not to include debt service as an expense which justifies—we think justifies the assessor's analysis.

The petitioner is required to meet the burden of proof which convinces this Court of a value other than that determined by the Supervisor. Based on the evidence in the present case, I'm not so convinced.

subject property. On appeal, the Supervisor contends that the circuit court erred in remanding the case and argues that the Tax Court's valuation should be given deference. Har Sinai contends that the Tax Court erred in valuing nonprofit property using traditional valuation approaches. Specifically, Har Sinai alleges that the valuation approach adopted by the Tax Court was flawed because it did not give the HUD restrictions full effect.

With this background in mind, we turn to the pivotal question of whether the Supervisor's valuation reflects the property's full cash value. Generally, full cash value is its market value, that is, "the value a willing purchaser will pay for it to a willing seller in an open market, eliminating exceptional and extraordinary conditions giving the property temporarily an abnormal value." *Rogan v. County Commissioners*, 194 Md. 299, 311, 71 A. 47 (1950); *see Supervisor v. The Ort Children Trust Four*, 294 Md. 195, 201, 448 A.2d 947 (1982); *Bornstein*, 227 Md. at 337, 176 A.2d 859. Although market value is generally an appropriate starting point in the valuation of property, it is not a required valuation method. Indeed, the Court of Appeals has suggested that market value of property would not be an appropriate value of the property in cases where "the property is of such a special nature that no market for it exists and then its intrinsic value must be ascertained by consideration of its cost, nature, utility, and other characteristics." *Fairchild Hiller*, 267 Md. at 521, 298 A.2d 148. Such was the case here, where the market value approach was rejected by both experts because the subject property was presently only marketable as non-profit housing and the experts knew of no sale of similar property.

The Supervisor's expert witness, Mr. McCann, used an income approach but included the impact on income and expenses caused by the HUD restrictions. For example, instead of adjusting actual expenses to conform with market expectations, he used actual expenses. He also used the actual mortgage sums to determine the capitalization rate and excluded a return on equity because this property

was run on a non-profit basis. Thus, his valuation of the subject property was based on HUD supported income, HUD required expenses, a non-equity return because of the property's nonprofit status, and the assumption of the HUD mortgage; it was $4,121,000. Pursuant to state practice, the Supervisor did not request an increase of the Property Tax Assessment Appeals Board value that had been set at $3,987,400; instead, the Supervisor asked that this value be affirmed.

In contrast, Har Sinai's expert, Mr. Campbell, used a discounted cash flow approach in which "the only income on this property is the equity build up that is made by principal payments each year on the mortgage."[6] This approach "takes into account the property's complete lack of marketability or return on investment until the year 2022," the year the HUD mortgage will be completely repaid; in doing so, it places no value on the fact, conceded by Mr. Campbell, that, if a buyer was found, any buyer would assume the mortgage balance, which at present exceeds $4 million. The methodology propounded by Mr. Campbell resulted in a valuation of $965,000—approximately $3,000,000 lower than the Supervisor's valuation.

After considering this testimony and substantial memoranda, the Tax Court upheld the Supervisor's valuation. As reflected in its oral opinion, the Tax Court was well aware

---

**6.** The value of the equity build up in present value dollars, according to Mr. Campbell, is approximately $574,000 to $610,000. In addition to the equity build up, Mr. Campbell testified that he included one other item in his appraisal of the property and that was the replacement reserve fund. According to Mr. Campbell, "[u]nder HUD requirements, you must fund money into a replacement reserve fund each year. It is the practice of HUD that once a hundred and forty-four payments have been made, that you are not required to make any further payments into this fund, unless indeed it's used for some replacement [of certain parts of the building as they wear out]. So I feel that that is value that goes with the mortgage." The replacement reserve fund are payments that are "put in a bank and draw[ ] interest." The present value of this replacement fund, as calculated by Mr. Campbell, is approximately $131,000 to $143,000. Also included in Mr. Campbell's calculation is the debt service reversion fund which is valued at approximately $190,000 to $208,000.

of the fact that the property at issue was not an apartment building used for normal investment purposes. The Tax Court, however, refused to find, as Har Sinai urged, that the property had no value other than "equity build up made by principal payments each year on the mortgage." Rather, the Tax Court found that the HUD restrictions, though certainly encumbrances to the future use and enjoyment of the property, did not make the property unmarketable. Instead, the Tax Court found that the HUD mortgage "can be assumed" and that the property was marketable though its market was limited to that of other nonprofit corporations. This determination by the Tax Court is in accord with Maryland law. *See, e.g., Ort Children Trust Four,* 294 Md. 195, 448 A.2d 947 (while long term lease—40 years if options are exercised—at below market rental value impeded property's capacity to produce more income, this impediment did not make the property valueless or unmarketable); *Meade Heights, Inc. v. State Tax Commission,* 202 Md. 20, 29, 95 A.2d 280 (1953) (apartments were constructed by taxpayer on government leased land; apartments were subject to certain restrictions, *e.g.,* they could only be subleased to military personnel and at approved rental amounts; the Court held that the leasehold interest and apartments could be valued and that "the fact that it is not wholly free of restrictions as to use does not ... render it immune from tax.")

The Tax Court specifically rejected Har Sinai's arguments that the Supervisor's valuation did not consider the HUD restrictions, finding that "the Supervisor did consider the [HUD] restrictions ... in the method that he used. He may not have ... quantified it as any specific reduction. But ... I think just a consideration of those restrictions is enough." [7] Moreover, the Tax Court found

---

7. Har Sinai heavily relies on the following testimony as assertedly demonstrating that the approach of Mr. McCann, the Supervisor's appraiser, "took into account only the benefits provided by the HUD

The property produces income, and the measurement of this income, I believe, provides a basis of valuation. The difference between the parties is substantial, almost Three Million. And it appears to result in part from [Har Sinai's] consideration of the debt service as part of their expert's income analysis methodology.[8]

---

program, while completely ignoring the negative impact of the HUD restrictions":

> Q. It is true, is it not, sir, that your approach to valuing this property did not take into consideration in any quantified sense, in any dollar or percentage sense, the fact that the marketability of this property is restricted as it is by the HUD regulatory agreement until the year 2022, correct?
>
> A. [by Mr. McCann] That's correct.
>
> Q. Okay. And it is also true, is it not, Mr. McCann, that your approach to the value of this property did not in any quantifiable sense take into account that the HUD regulatory agreement for this property restricts any owner of it from now until the year 2022 ... from deriving any operating profit of any kind or any dividend out ... of this, right.
>
> Q. [by Mr. McCann] That is correct.

All that this exchange demonstrates is that Mr. McCann did not consider that the HUD agreement restricts until 2022 the *marketability of* the property and the ability of owner to derive an *operating profit from the property.* It is undisputed, as the Tax Court found, that Mr. McCann did consider the negative impact of the restrictions imposed by the HUD agreement in reaching his appraisal. He used actual income, actual expenses, a lower capitalization rate and excluded any return on equity; Mr. McCann simply did not consider the negative impacts in the way Har Sinai wanted him to. There is no requirement that he do so.

8. Thus, as the Tax Court implied, the assessment by Har Sinai's expert, based on a discounted cash flow, in which the only item considered as income was the equity build up resulting from the principal payments on the mortgage, in fact takes account *only* of the "negative impacts" of the HUD restrictions and ignores their "benefits." Value is not only what a willing buyer will *pay* for a piece of property but also includes the mortgages or other indebtedness that a buyer is willing to assume for the seller in exchange for the property. Even Har Sinai's expert agreed, in response to a hypothetical question, that a prospective buyer of the subject property would assume any outstanding mortgage debt. To not include this assumption of debt in the value of the property would in effect mean that the property is only valued at the owner's equity. This argument was rejected many years ago. *See Allen v. County Commissioners,* 74 Md. 294, 295–96, 22 A. 398 (1891). *See also Meade Heights,* 202 Md. at 31, 95 A.2d 280 ("[m]anifestly ... an elimination [of debt service] is improper in determining taxable

The circuit court found that *Shell Oil Co. v. Super. of Assessments,* 278 Md. 659, 366 A.2d 369 (1976) and *Mercantile–Safe Deposit & Trust Co. v. Mayor and City Council of Baltimore,* 308 Md. 627, 521 A.2d 734 (1987) "impose a legal standard which has not been met". The court below reasoned:

The lengthy "laundry list" of assessment considerations found in *Shell Oil* was republished here to emphasize the necessity of considering significant value influence, and to some reasonable extent articulating and quantifying them. The record here does not evidence that. The best that can be gleaned from the record is that both Mr. McCann and the Maryland Tax Court believed that those influences were inherent in the McCann appraisal methodology. But how and to what extent they impact on valuation is not sufficiently clear, as a matter of law.

Contrary to the circuit court's suggestion, neither *Shell Oil* nor *Mercantile–Safe Deposit* requires or even implies that the Tax Court must articulate and quantify "significant value influence[s]," such as the HUD restrictions, when determining the value of a property case. *Shell Oil's* list of factors simply emphasizes that each parcel of land is different and that although land in the same taxing classification must be assessed and taxed uniformly, assessors may consider dissimilarities in determining value. *Shell Oil,* 278 Md. at 666–667, 366 A.2d 369. *Mercantile–Safe*

value"); *Rebelwood, Ltd. v. Hinds County,* 544 So.2d 1356, 1365 (Miss.1989) (value of federal subsidy or benefits must be considered in establishing value of nonprofit housing project); *Steel v. Allentown,* 124 N.H. 487, 471 A.2d 1179, 1182 (1984) (federal subsidies should not be ignored in assessing value of elderly housing project); *Kankakee Cty. v. Property Tax Appeal Bd.,* 131 Ill.2d 1, 136 Ill.Dec. 76, 83, 544 N.E.2d 762, 769 (1989) (federal rent subsidy must be considered in assessing the value of housing project); *Executive Square Ltd. Partnership v. Town of Wethersfield,* 11 Conn.App. 566, 528 A.2d 409, 413 (1987) (trial court did not err in including federal reimbursement subsidies as actual rental income in valuation of housing project); *Comstock Village Ltd. Dividend Housing Ass'n v. Comstock Twp.,* 168 Mich.App. 755, 425 N.W.2d 702, 705 (1987), *leave to appeal denied,* 431 Mich. 911 (1988) (rent subsidy should be considered in valuation process).

*Deposit* deals with covenants running with the land and their impact on valuing property; it recognized such covenants as a possible valuation influence but did not distinguish their impact on value from any other valuation influence. Rather, the Court concluded simply that "[t]o the extent the covenants enhanced the value of the land they are compensable." *Mercantile–Safe Deposit,* 308 Md. at 646, 521 A.2d 734. "It is firmly established in this State that the relative weight to be accorded to any relevant factor in a particular case is for the assessing authorities and not for the courts." *Bornstein,* 227 Md. at 337, 176 A.2d 859. The circuit court's holding is directly at odds with this settled principle. Accordingly, it must be reversed.

In sum, the Tax Court did not err in accepting the Supervisor's valuation of the property. Its decision reflects a proper understanding of the law and is supported by substantial evidence.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO AFFIRM THE ORDER OF THE TAX COURT.

COSTS TO BE PAID BY APPELLEE AND CROSS–APPELLANT, HAR SINAI WEST CORPORATION.