762 A.2d 564

STATE DEPARTMENT OF ASSESSMENT AND TAXATION

v.

NORTH BALTIMORE CENTER, INC.

No. 15, Sept. Term, 2000.

Court of Appeals of Maryland.

Nov. 17, 2000.

William K. Hammond, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General of Maryland, on brief), Balitmore, for petitioner.

Barry Weiskopf (Hilary J. O'Connor of Tydings & Rosenberg, LLP, on brief), Baltimore, for respondent.

T. Scott Basik, T. Scott Basik, P.A., Timonium, Peter V. Berns, Debra A. Jung, Baltimore, for Amicus Curiae, Brief of Maryland Association of Nonprofit Organizations filed on behalf of respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY,* RAKER, WILNER, CATHELL and HARRELL, JJ.

BELL, Chief Judge.

This case presents the issue of whether a nonprofit corporation, almost entirely supported by government funds, and primarily providing outpatient mental health services to indigent members of the community, is eligible for a charitable exemption under Md.Code (1986, 1994 Repl.Vol., 2000 Supp.) § 7–202(b)(1) of the Tax Property Article.[1] A similar issue was decided by this Court in *Supervisor of Assessments v. Group Health Ass'n, Inc.*, 308 Md. 151, 517 A.2d 1076 (1986). In fact, the parties maintain that the decision in that case controls the decision in this one. Consequently, we will revisit that case before further considering the facts of the case sub judice.

Group Health, a nonprofit HMO exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code, operated seven health centers in the Washington, D.C. metro-

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Md.Code (1986, 1994 Repl.Vol., 2000 Supp.) § 7–202(b)(1) of the Tax–Property Article provides, in pertinent part:

"(b)(1) Except as provided in subsection (c) of this section, property is not subject to property tax if the property:

"(i) is necessary for and actually used exclusively for a charitable or educational purpose to promote the general welfare of the people of the State, including an activity or an athletic program of an educational institution; and

"(ii) is owned by:

"1. a nonprofit hospital;

"2. a nonprofit charitable, fraternal, educational, or literary organization...."

politan area, providing in each health services to its members on a prepaid basis. Membership could be acquired in two ways, either through a group employment plan or on an individual basis, and at a membership cost ranging from $66.00 per month to $218.80 per month, depending on the type of coverage provided. Besides providing general health care services, Group Health maintained a Special Assistance Fund to assist its members who were unable, due to some unusual financial difficulty, to continue paying membership costs. It also conducted educational programs on various health topics, participated in internship programs with area medical schools, and operated a Minor Injury Unit, providing treatment to both members and nonmembers, in downtown Washington, D.C. While the educational programs were open to members and nonmembers, Group Health members were given preference if space was limited and the programs were advertised by posting brochures in its facilities.

Group Health sought a property tax exemption for its Rockville facility on the basis that it was a charitable organization. When the exemption was denied by both the Supervisor of Assessments of Montgomery County ("Supervisor") and the Property Tax Assessment Appeal Board of Montgomery County, Group Health appealed to the Maryland Tax Court, which also denied the exemption, but only after considering evidence offered by Group Health to establish that it was a charitable organization [2] and evidence offered by the Supervisor to establish the opposite.[3]

---

**2.** According to Group Health, "(1) it provide[d] health care to 50,000–60,000 Maryland residents; (2) it provide[d] individuals and employees with a means to obtain comprehensive health care while simultaneously curbing costs; (3) it benefit[ed] all Maryland residents by exerting substantial downward pressure on the costs of health care; and (4) it benefit[ed] Maryland residents through its various professional, educational, and emergency programs." *Supervisor of Assessments v. Group Health Ass'n, Inc.*, 308 Md. 151, 154, 517 A.2d 1076, 1077 (1986).

**3.** The Supervisor, on the other hand, offered evidence intended to prove that Group Health was nothing more than a cooperative organization providing services to its members, including that it was supported

Noting the prerequisites that must be met to qualify for an exemption from real property taxation—the property must be owned by a nonprofit charitable, benevolent, or educational organization and must actually be used, and be necessary, for charitable, benevolent, or educational purposes, the Tax Court concluded that Group Health, not being a charitable organization, was not entitled to an exemption from real property taxation. This conclusion was supported by its findings that Group Health's purpose was "to provide medical care for a reasonable price ... more or less it's a prepaid medical care facility," that although providing some educational services to its members, "from a factual standpoint ... the primary purpose of this organization is to provide high quality medical care, and I emphasize high quality, to its members for a fee," and that "[t]he charitable and educational aspect and benevolent aspects of Group Health Association's activities ... are only incidental to its main function, and that is to provide high quality medical care." The Tax Court also stated, along the same lines:

> "This Court does not intend to in any way minimize the value of the organization, in its attempt to help the public welfare, in very general terms. But we think that the benefit to the general public is certainly secondary to the benefit afforded to its members and its doctors and its employees."

On judicial review in the Circuit Court for Montgomery County, the Tax Court's decision was reversed. Subsequently, we granted the Supervisor's petition for writ of certiorari.

The question presented in *Group Health* was "whether a nonprofit health maintenance organization (HMO), which operates primarily to provide health care services to its prepaid members, is a 'charitable organization' for purposes of the property tax exemption provided by" the predecessor of

---

almost exclusively by membership charges, not donations, and that it does not benefit any nonmembers, even those who are indigent or infirm. *See Group Health*, 308 Md. at 154, 517 A.2d at 1077.

§ 7–202(b)(1).[4] We answered the question in the negative. But more interesting for our purposes than the resolution of the issue is the analysis by which we arrived at it.

After stating the standard of review of a decision of the Tax Court, an administrative agency, and noting the narrowness of that standard,[5] we rejected Group Health's argument that the Tax Court erred as a matter of law, stating in the process the test that is dispositive of the case *sub judice:*

> "The Tax Court did not make an error of law. The court reviewed § 9(e)(2) and recognized that the section provides a tax exemption from real property that is (1) owned by a charitable, benevolent, or educational organization and (2) actually used and necessary for the charitable, benevolent, or educational purposes. We do not at this time attempt to establish a hard-and-fast rule as to the meaning of 'charita-

---

**4.** When *Group Health* was decided, the applicable statute in effect was Maryland Code (1957, 1980 Repl.Vol.), Art. 81, § 9(e)(2), which exempted property owned by

> "any nonprofit charitable, fraternal or sororal, benevolent, educational, or literary institutions or organizations ... when any of such property described above is actually used exclusively for and necessary for charitable, benevolent, or educational purposes ... in the promotion of the general public welfare of the people of the State."

**5.** The Court stated:

> "Maryland Code (1957, 1980 Repl.Vol., 1986 Cum.Supp.), Art. 81, § 229(*o*), provides that on appeal '[t]he circuit court shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record.' When this Court reviews a Tax Court decision, the narrow scope of review set forth in § 229(*o*) is equally applicable. *See, e.g., Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296, 1303 (1985); *Comptroller v. Haskin,* 298 Md. 681, 689–90, 472 A.2d 70, 76–77 (1984); *Comptroller v. Diebold, Inc.,* 279 Md. 401, 407, 369 A.2d 77, 81 (1977)."

The standard of review still obtains. *See Read v. Supervisor,* 354 Md. 383, 731 A.2d 868 (1999); *Roach v. Comptroller,* 327 Md. 438, 610 A.2d 754 (1992); *Friends School v. Supervisor,* 314 Md. 194, 550 A.2d 657 (1988). However, Art. 81, § 229(*o*) has been replaced with Maryland Code (1988, 1997 Repl.Vol.), § 13–532(a) of the Tax-General Article. Section 13–532 provides that the final order of the Tax Court is subject to judicial review as provided in §§ 10–222 and 10–223 of the State Government Article, governing the standard of review for decisions of administrative agencies.

ble' for purposes of § 9(e)(2). Indeed, we doubt whether such a rule can be formulated.... Clearly, however, a determination of whether an institution is charitable must include a careful examination of the stated purposes of the organization, the actual work performed, the extent to which the work performed benefits the community and the public welfare in general, and the support provided by donations.... The Tax Court considered all of these factors, and we think the Tax Court understood the law and applied it correctly to the facts."

308 Md. at 156, 517 A.2d at 1079 (citations omitted).

Next the Court applied the substantial evidence test. It reached the same result, reached by the Tax Court reasoning:

"We think that a reasoning mind could easily reach the Tax Court's conclusion based on the record in this case. The Tax Court found as a fact that GHA's primary purpose is not charitable, benevolent, or educational, but rather is to provide 'high quality medical care to its members for a fee.' The Tax Court also found as a fact that GHA's charitable, benevolent, and educational aspects are only incidental to its main function of providing health care services to its members. Although the Tax Court noted that GHA attempted to 'help the public welfare, in very general terms,' it concluded that the benefit to the public is 'certainly secondary to the benefit afforded to its members and its doctors and its employees.' We believe that the record amply supports these findings. GHA's Articles of Incorporation, Certificate of Reincorporation, and bylaws all declare that the purpose of the organization is to provide medical care to members and their dependents. Moreover, there was testimony that providing health care services is, in actuality, the major activity carried on by GHA. Furthermore, there was evidence that GHA does not take 'charity' cases. Finally, testimony showed that GHA receives only de minimis contributions and is supported almost solely by membership fees.

"Contrary to the opinion and order of the circuit court, we do not think that the Tax Court concluded that the provision

of medical services for a fee could simply not be charitable or benevolent within the meaning of the statute. Rather, the Tax Court simply found that GHA did not provide sufficient benefit to the community to justify exemption from real property taxes. The Tax Court's factual determination that GHA is not a charitable organization is supported by substantial evidence."

*Id.* at 160–61, 517 A.2d at 1080–81 (citations omitted).

The appellee, North Baltimore Center, Inc., ("NBC"), is a community mental health center operating in Baltimore City and providing counseling and rehabilitative services to mentally ill patients, most of whom are well below the poverty level.[6] As a community health program provider, the appellee is regulated by the Department of Health and Mental Hygiene. It also contracts with the Mental Health Administration, which has a statutory obligation to provide mental health services to the indigent, an obligation it fulfills through such contracts

---

**6.** Appellee's stated mission is:

"To promote and provide high quality mental health services to people of all ages who are acutely or chronologically ill, physically handicapped, chemically dependent or in crisis, and to children and adolescents with emotional or behavioral difficulties. It is further the mission of the Center to provide leadership in educating the public to understand mental illness; to publicize and encourage the use of preventive mental health services; to facilities significant community involvement in the planning utilization, and evaluation of mental health services; and to solicit comprehensive public and private financial support for mental health services."

Services offered by the North Baltimore Center include:

"(1) Intake/Evaluation Services: The focus of the initial psychiatric evaluation is to provide quality psychiatric assessment and intervention as expeditiously as possible.

"(2) Adult/Geriatric Program: Serves clients 18 years of age and older, addressing the unique needs of person with acute or chronic mental illness.

"(3) Child and Adolescent Program: A satellite program at Booker T. Washington Middle School, Project SUCCEED, provides mental health services to students who are enrolled in school.

"(4) Psychiatric Rehabilitation Program: Provides transitional and continuing rehabilitation services for adults with serious and persistent mental illness. Rehabilitation services focus on assisting such persons in developing the skills and supports necessary for successful living in the community."

with mental health providers, such as the appellee. The majority of the appellee's income comes from state and federal government funds; only a relatively small amount of support comes from charitable donations. In fact, excluding four volunteers, each of whom worked 600–800 hours per year, private charitable donations accounted for less than 1% of total revenue.

The appellee applied to the appellant, State Department of Assessments and Taxation (SDAT), for a charitable property tax exemption for its building, which it purchased with funds obtained through a grant from the State Department of Health and Mental Hygiene and funds obtained through a tax-free bond issue. The appellant denied the exemption, noting that NBC had failed to secure significant private donations. Relying on *Group Health*, and, in particular, our statement of the factors to be considered when determining whether an institution or organization is charitable, it deemed that fact dispositive. NBC appealed the denial of the exemption to the Property Tax Assessments Appeals Board for Baltimore City ("PTAAB"), which affirmed the SDAT's action.

NBC successfully appealed to the Maryland Tax Court. In reversing the decision of the PTAAB, the Tax Court demonstrated its grasp of the facts and the law applicable to this case. It began its analysis with *Group Health*. After quoting this Court's statement that it was not attempting "to establish a hard and fast rule as to the meaning of 'charitable,'" and doubt that such a rule could be formulated, it stated its agreement that "it would be very difficult to formulate a rule as to something that would be fair and reasonable to necessarily encompass the facts and circumstances of every particular case." Then, stating the considerations that must go into determining whether an organization is charitable, the Tax Court observed:

> "Now, it doesn't make sense to me that the Court of Appeals is going to say in the previous sentences that it is not attempting and indeed is not establishing a hard and fast rule, and then we're going to come over and say but look at those four points. Unless we can turn around and

take every, given situation and be sure it falls within the [ambit] of what was set forth by the Court of Appeals on page 157 of that case, then you can't decide a case without doing that."

To be sure, the Tax Court stated its "common sense" reaction to the Supervisor's argument that the paucity of charitable contributions was fatal to NBC's claim,[7] but it is clear that it based its decision on a consideration and weighing of the *Group Health* factors:

"Now let me take into consideration the various criteria that has been suggested as what must be considered in connection with cases such as this. And one of them, when we speak about the examination of the stated purposes of the organization, I see nothing whatsoever in all the evidence that I have heard and read that says any other thing than the fact that this organization stands ready, willing and able and does in fact perform services to the masses.

"And when I say masses there is certain eligibility that is necessary in order for it to be treated by the North Baltimore Center, Incorporated. And then Mr. Hammond continually made a point about the fact that well they have to treat them whether they want to treat them or not.

"In other words they're required by the legal structure under which they exist to take these people in whether they want to take them in or not. And I think that actually goes as a—something that is meaningful from the standpoint as to why this exemption should be granted.

"So when I look at the purposes of the organization, when I move on to the actual work performed by the Petitioner, and when I look to the extent to which the work performed

---

7. The Tax Court stated that "common sense tells me that it would be absurd for this Court to conclude, under the circumstances that exist in this case, that the exemption should not be granted." Among the reasons the court gave for that common sense reaction was that NBC should not pay either state or local property tax because it was entirely funded by the State, and Baltimore City would get a "windfall," that "[i]t simply is absolutely stupid to turn around and have the state transferring money from one pocket to another."

benefits the community and public welfare in general, I don't think there is any question about that.

\* \* \* \*

"Again there has been no witness who testified in connection with this case who does not readily accept that North Baltimore Center, Inc. does not only perform a substantial service to the community and the citizenry, but that it apparently does a good job in connection with discharging these services."

With regard to the fourth factor, the support provided by contributions, the Tax Court expressed some uncertainty as to its meaning—"Does that mean that the fact that they receive some donations and very little, that it should be disregarded because [it is] not enough? That the percentage isn't high enough?" Noting that the test did not explicitly reference or address the minimum level of support from contributions required and indicating its doubt as to whether a finding in that regard needed to be made, the Tax Court pointed out that, although not the critical reason for the decision, the money flowing from the State to NBC could be characterized as donations. Implicitly, therefore, the Tax Court found that substantial charitable contributions were not required to meet the *Group Health* test.

The Supervisor sought judicial review in the Circuit Court for Baltimore City. Finding that there was substantial evidence in the record to support the Tax Court's decision and that the Tax Court did not err as a matter of law, that court affirmed. The Supervisor fared no better in the intermediate appellate court. The Court of Special Appeals, after an exhaustive discussion of the historical development of charitable organizations and an equally exhaustive analysis of the meaning of the term, "charitable," interpreted § 7–202(b)(1) as not requiring significant private donations. *State Department of Assessments & Taxation v. North Baltimore Ctr., Inc.*, 129 Md.App. 588, 611, 743 A.2d 759, 772 (2000). Moreover, it did not read *Group Health* as "necessarily requiring significant

private donations but as having identified factors to be considered in making what is always a factual determination." *Id.* at 610–11, 743 A.2d at 772. The court opined:

"On the facts before us, specifically, (1) a clear and virtually conceded charitable purpose, (2) the work performed was charitable, (3) the existence of a benefit to the general public, (4) support for appellee from public funds through grants and programs to aid persons in need, and (5) some, albeit minimal, private assistance to appellee, we cannot say the tax court lacked evidence to sustain its decision."

*Id.* at 611, 743 A.2d at 772.

The SDAT's argument is that "[a] nonprofit organization that does not receive significant private donations and is almost entirely supported by government funds is not entitled to a charitable exemption under ... § 7–202(b)(1)." Critical to this argument is, as the SDAT contends, that the charitable contributions prong of the test enunciated in *Group Health* requires that an organization seeking a charitable exemption receive significant charitable contributions, *i.e.,* donations. Also fundamental to this argument is that failure to apply this critical factor necessarily results in the commission of legal error in the application of the remaining *Group Health* factors.[8] As to this, the SDAT points to the testimony of its witness that, had there been significant charitable contributions, NBC likely would have met all of the prongs of the *Group Health* test and asserts, citing *Supervisor of Assessments v. Har Sinai West Corp.,* 95 Md.App. 631, 643, 622 A.2d 786, 790 (1993), that "[t]his is because the contributions imbue the purposes, activities and general public welfare factors with their *charitable character."*

We agree with the Circuit Court and the Court of Special Appeals that the Tax Court did not err as a matter of law and its decision is supported by substantial evidence in the record. Accordingly, we shall affirm.

---

**8.** The SDAT also maintains that not only must each of the four factors of the *Group Health* test be considered, but each must be met before an organization may qualify for a charitable exemption.

It is true, of course, that the four step analysis in *Group Health* has been considered and applied by both this Court and the Court of Special Appeals. See, in addition to *Group Health, Comptroller v. Maryland State Bar*, 314 Md. 655, 669, 552 A.2d 1268, 1275 (1989); *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.*, 313 Md. 614, 634, 547 A.2d 190, 199 (1988); *Rivera v. Prince George's County Health Dept.*, 102 Md.App. 456, 464, 649 A.2d 1212, 1216; *Supervisor of Assessments v. Har Sinai W. Corp.*, 95 Md.App. 631, 638–39, 622 A.2d 786, 790–91 (1993); *Vulcan Blazers of Baltimore City, Inc. v. Comptroller*, 80 Md.App. 377, 384–85, 564 A.2d 77, 80–81 (1989). And it likewise is true, as the SDAT points out, that this Court, when applying the test, has referred to the level of charitable contributions the organization seeking exemption has received. *See Maryland State Bar Ass'n.*, 314 Md. at 670, 552 A.2d at 1275 (noting that "[the Tax Court] also considered the amount of support provided by donations, finding that the Association's income is derived almost exclusively from dues and fees"); *Asbury Methodist Home*, 313 Md. at 619 n. 5, 547 A.2d at 192 n. 5 (mentioning the small amount of charitable contributions); *Group Health*, 308 Md. at 160, 517 A.2d at 1080 ( finding that "GHA receive[d] only *de minimis* contributions and [was] supported almost solely by membership fees"). It is not true, however, that any of these cases turned on whether, and if so, what level of, private donations are required to qualify for the charitable exemption.

In *Maryland State Bar Ass'n*, 314 Md. at 670–71, 552 A.2d at 1275, we affirmed the finding of the Tax Court that the Maryland State Bar Association was not a charitable organization, the majority of the services it provided being to and for Bar Association me members, and income was derived almost exclusively from membership dues and fees.

In *Asbury Methodist Home, Inc.*, 313 Md. at 614, 547 A.2d at 190, a charitable corporation challenged the decision of the Tax Court denying a real property tax exemption for apartments for the elderly, which were owned and operated by a nonprofit, charitable corporation. The Tax Court had held

that the apartments, providing moderate income housing to the elderly, did not fulfill a charitable purpose and, thus, were not entitled to property tax exemption. We held that the Tax Court finding was supported by substantial evidence. In particular, there was evidence of significant financial requirements imposed upon applicants and significant medical and financial screening in order to gain admission. *See* 313 Md. at 635–36, 547 A.2d at 200.

In *Rivera*, 102 Md.App. at 456, 649 A.2d at 1212, the Court of Special Appeals considered whether the State Health Department, a governmental agency, was a charitable organization for purposes of charitable immunity. In doing so, the Court considered the four factors set forth in *Group Health,* concluding in the negative because the State Health Department "[was] not a separate entity operated by the County as a proprietary function, nor is it supported by donations." 102 Md.App. at 464–65, 649 A.2d at 1216.

In *Vulcan Blazers,* 80 Md.App. at 377, 564 A.2d at 77, the Court of Special Appeals reversed a Tax Court determination that an association of black firefighters was exempt from admissions and amusement tax. The court held that the Tax Court did not apply the correct principles of law governing the case, having failed to consider the factors set forth in *Group Health,* and, instead, had incorrectly reasoned that "because firefighters are indispensable public servants and because they work under unusually dangerous and stressful conditions, any expenditures by a firefighters organization that improve 'morale' are 'charitable' within the meaning of Md.Code (1957, 1984 Repl.Vol.) art. 81, § 406(1),[9] even though under ordinary circumstances they simply would be fraternal." 80 Md.App. at 384, 564 A.2d at 81. In addition, the statute at issue was not

---

9. Section 406, in pertinent part, provides:
   "No tax shall be levied or collected ... (1) Upon the gross receipts derived from the amounts charged for admissions or refreshments, service and merchandise when such gross receipts are devoted exclusively to charitable, religious or educational purposes...."
   Article 81, § 406 has been recodified as Md.Code (1988, 1997 Repl.Vol., 2000 Supp.) § 4–103 of the Tax–General Article.

§ 7–202 or its predecessor, but one that exempted from the tax some, but not all, fire department and fraternal-type organizations.

In *Har Sinai W. Corp.*, 95 Md.App. at 633, 622 A.2d at 788, the taxpayer constructed a high-rise apartment building for the elderly and handicapped with proceeds from a HUD loan. In addition, Har Sinai received HUD rental subsidies. Thus, all revenues from the project were federal subsidies and rental payments made by tenants. The Court of Special Appeals held that the low income high-rise building, owned and operated by a non-profit corporation, providing non-profit housing to its tenants, was not entitled to a tax exemption because the apartment building was funded entirely by federal subsidies and rent paid by tenants. *See id.* at at 631, 622 A.2d at 786. The Court stated as a part of its analysis that federal rent subsidies were not "donations" under the four-factor test set forth in *Group Health*. *Id.* at 642, 622 A.2d at 792. While the *Group Health* test was examined in *Har Sinai W. Corp.*, the question was not whether the entity involved, a nonprofit housing corporation under § 7–202(b)(4), was a charitable organization but, rather, whether, a charitable purpose was being served.

More fundamentally, acceptance of the SDAT's argument in the present case would be inconsistent with the *Group Health* test for two reasons. First, we made clear in *Group Health*, reiterated in *Maryland State Bar Association, supra* at 669, 552 A.2d at 1275, that it was not our intention to pronounce a hard-and-fast rule, although setting out factors that must be seriously considered in determining entitlement to a charitable exemption. Even further, neither factor is intended to be determinative of a case. Instead, a trier of fact should apply a balancing test which encompasses each of the four factors set forth in *Group Health*. The SDAT's approach disregards that statement of analytical intent and, in fact, as the Tax Court recognized, requires just the opposite, that the *Group Health* test be treated, and applied, as a hard-and-fast rule.

Furthermore, despite its profession to favor a four part test, the SDAT in fact argues for a single factor test, a charitable contribution or donation test. Under its argument, the failure to establish significant donations would trump the other three factors and thus makes that one factor always decisive. That too is a hard-and-fast rule, which, had this Court intended it, could, and would, have been more clearly stated.

JUDGMENT AFFIRMED, WITH COSTS.